Andrew A. HUSOVSKY

v.

UNITED STATES of America, Appellant, the District of Columbia, a Municipal Corporation.

Andrew A. HUSOVSKY

v.

UNITED STATES of America.

Appeal of the DISTRICT OF COLUMBIA, a Municipal Corporation.

Nos. 76–1533, 76–1534.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1977.

Decided June 27, 1978.

---

John R. Risher, Jr., Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Richard W. Barton and George T. Masson, Jr., Asst. Corp. Counsels, Washington, D. C., were on the brief, for the District of Columbia. Leo N. Gorman and Ted P. Gerarden, Asst. Corp. Counsels, Washington, D. C., also entered appearances for the District of Columbia.

John G. Laughlin, Sp. Litigation Counsel, Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Rex E. Lee, Asst. Atty. Gen., and Ronald R. Glancz, Asst. Chief, Dept. of Justice, Washington, D. C., were on the brief, for the United States.

Harry W. Goldberg, Washington, D. C., with whom Morris Altman, Washington, D. C., was on the brief, for appellee, Andrew A. Husovsky.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

Appellee sustained severe injuries when a tree fell upon the automobile he was driving along Klingle Road in Rock Creek Park in the City of Washington. He initially filed a claim for damages with the United States Department of the Interior, and after this was denied, he brought suit in the District Court against both the United States and the District of Columbia.[1] His claim against the United States, under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671–80 (1970)), was tried to the court simultaneously with the jury trial of his claim against the District. After the jury returned a verdict and assessed damages for appellee, the court also held in favor of and awarded damages to him in his suit against the United States, entering its findings of fact and conclusions of law in detail and at length. Judgment for appellee was accordingly entered in both cases.

The central issue on these appeals therefrom is whether, on the proof made, liability for the fall of the tree can lawfully be attributed to the negligence of one or both appellants. A question is also raised concerning the proper assessment of damages in the FTCA suit. For the reasons explained below, we find no basis upon which to upset the judgments entered by the District Court.

I

The record in this case is voluminous, but the basic facts concerning the circumstances in which the accident occurred are unambiguous and undisputed.[2] On the morning

1. Appellee's complaint having been filed in the District Court prior to the effective date of the District of Columbia Court Reorganization Act of 1970, Pub.L. 91–358, § 111, tit. I, 84 Stat. 476, jurisdiction over the claim against the District of Columbia is pursuant to 11 D.C.Code § 501(1) (1973).

2. This recital of facts draws upon and is consistent with the Findings of Fact entered by the District Court, Mem.Op. at 1–11, Brief for Appellee in Response to United States of America at 1a–11a, that are undisputed on appeal, and includes additional description of evidence relating particularly to the claim against the District of Columbia.

of August 19, 1968, a sunny, windless day, appellee, on his way to classes at Georgetown University was driving westward on Klingle Road as it traverses Rock Creek Park, when a portion of a triple-trunked tulip popular tree growing on adjacent, wooded land titled to the Government of India fell upon his car, causing it to flip over and resulting in permanent injuries to appellee's spinal column.

The Klingle Road right-of-way is a public street owned by the District of Columbia. The tulip poplar tree in question grew less than six feet from the northeasternmost edge of the right-of-way, approximately forty-six feet from the northernmost edge of the paved portion of the road. The portion of the tree which fell was the southernmost—or closest to the roadway—of the three trunk stems, and the fallen portion itself weighed an estimated ten tons and measured approximately ninety feet in height and twenty-one inches in diameter. Immediate inspection of both the felled trunk stem and the stump from which it had torn away revealed rot, App. 228–29, 406–07, but photographic evidence and two witnesses at the trial also indicated that the tree, including the felled stem, had been in foliage.[3] There was no eyewitness testimony concerning the angulation of the tree stem prior to its fall. However, there was in evidence before the jury an admission by the District of Columbia that the stem had overhung both the right-of-way and the roadway, App. 225; the United States was

not requested to make, and did not make, a similar admission.

The crotch of the tree where the tree trunk stems came together was V-shaped in formation, and there was testimony that this trunk portion of the tree was visible from the roadway during the winter, App. 412–13, 435–36.[4] Substantial evidence was introduced concerning the susceptibility of V-crotched trees to structural weakening and rot. This evidence included a manual of the National Park Service stating that V-shaped trunk formations are inherently weak, and that this condition may be remedied by removing, cutting back, or cabling the weakly supported stem.[5]

Klingle Road is generally bounded on both sides by Rock Creek Park,[6] a federally owned and maintained park located in the heart of the District of Columbia. The National Capital Planning Commission acquired and has maintained the lands comprising the park pursuant to congressional authorization to "preserve forests and natural scenery in and about Washington. . . ."[7] While the resulting Park is a heavily wooded expanse resembling a rural forest, it of course differs from the latter in significant ways due to its urban location. It is near to commercial and residential areas and is traversed by major traffic arteries, such as Klingle Road, which is a heavily travelled thoroughfare.

In pursuit of its mandate to develop and maintain Rock Creek Park, the Planning Commission had decided in 1945 to purchase

3. The District Court found that, "[t]here was conflicting testimony as to whether the tree from which the trunk fell was in foilage." Mem.Op. at 5, Brief for Appellee in Response to United States of America at 5a.

4. The District Court found that "prior to its fall onto Klingle Road, the southernmost trunk of the tree which overhung Klingle Road, was visible from the roadside." Mem.Op. at 10, Brief of Appellee in Response to United States of America at 10a.

5. An expert arborist testified that he considered this V-shaped tulip poplar tree to have been a potential hazard to the roadway and that it should have been cut back or cabled under prevailing standards of tree care and maintenance, App. at 856–59. The District Court entered a Finding of Fact that "the pre-

vailing standard of care by experienced arborists is to either brace, cable, or completely remove the large leaning trunk. . . ." Mem.Op. at 11, Brief for Appellee in Response to United States of America at 11a.

6. This part of Rock Creek Park is known as the Klingle Valley Parkway, a portion of National Capital Parks North.

7. Act of June 6, 1924, P.L. 202, 68th Cong., 1st Sess., 43 Stat. 463, *as amended by* Act of April 30, 1926, P.L. 158, 69th Cong., 1st Sess., 44 Stat. 374, establishing the National Capital Park and Planning Commission, which was the predecessor of the National Capital Planning Commission.

the tract of land upon which the tulip poplar stood, in conjunction with a land purchase program for building a new park access road (Klingle Road). However, because the Government of India had recently acquired the tract, which borders on Klingle Road for approximately five hundred feet,[8] the Commission sought the advice of the State Department, which was unable to convince the Indian Government either to sell the land or to agree to a recorded covenant prohibiting any disturbance of the natural state of the land.[9] The Commission thereupon stated that it would be satisfied if, in the alternative, the Indian Government would agree in writing not to disturb the land in question. The Indian Government assented to this proposal, and promised in a letter written to the Commission in 1947 to "preserve the present natural park-like character" of the tract [10] and to inform the Commission should the embassy property be offered for sale, "in order to enable [the Commission] to make the desired arrangements with the purchaser." [11]

Pursuant to this agreement, the tract of land on which the fallen tulip poplar stood has been left in a wooded state indistinguishable from contiguous federal parkland. From 1945 through the date of appellee's injuries, the tract was marked with wooden stakes and granite boundary monuments bearing United States insignia, identical with those located on federally owned lands.[12] In addition, the wooden stakes had been periodically repainted, replaced, or restenciled by employees of the National Park Service, a federal agency, in the interim since 1945.

The National Park Service has responsibility for maintaining and servicing Rock Creek Park, this portion of which the Service has designed as a "Class C" park, requiring weekly observations for the detection of diseased trees. Park Service employees responsible for these inspections testified at the trial in the District Court that not until a year after the occurrence of the accident involved in this appeal did it come to their attention that the tract of land upon which the tulip poplar stood was not federally owned, App. 510–16; for at least ten years prior to the accident the Service undertook to service and maintain the tract as it did Class C federal parkland.

Klingle Road itself is maintained jointly by the District of Columbia and the National Park Service. As prescribed by the Park Service's Class C maintenance schedule, this maintenance as of the time the tulip poplar fell consisted of weekly drive-through inspections of the forest land proximate to the right-of-way; again, no distinction was made by District or federal employees between the tract of land on which the tulip poplar grew and adjacent public land. The Park Service and the District's Trees and Parks Division were fully equipped to perform any type of forestry maintenance required, and diseased or otherwise dangerous branches and growth were removed by both District and Park Service personnel. Cabling of diseased or dangerous trees, a more expensive procedure than removal, was not

---

**8.** The tract of land, which is approximately five acres and fronts on 2700 Macomb St., N.W., is part of the Indian Embassy in the City of Washington.

**9.** The proposed covenant would have provided that no building would be erected, that no signs would be placed, and "that no trees with trunks of 6 inches in diameter or over, measured 12 inches above the ground, shall be cut, destroyed or removed. . . ." App.Exh. U.S. # 15–23.

**10.** App.Exh. U.S. # 15–18.

**11.** App.Exh. U.S. # 15–14. The Commission successfully obtained the remaining land parcels within the Klingle Valley Parkway land

purchase program through either purchase agreement or condemnation proceedings.

**12.** The stakes and granite monuments were placed by the National Park Service in anticipation of acquisition of the tract by the federal government. Also in 1945, the tract was surveyed by both the District of Columbia and the National Park Service, which resurveyed the tract in 1964. The insignia on the monuments consisted of the letters "U.S.P.," which it was established at trial stand for either "United States Property" or "United States Parks." A Park Service employee testified that these markers are placed for the purpose of denoting public property.

generally undertaken in Class C park areas, App. 697–700, 764.

## II

We first consider the liability of the District of Columbia. No objection is made to the instructions given to the jury, which clearly required that, in order for the District to be held liable, it was necessary for the jury to find by a preponderance of the evidence that the District had failed to exercise reasonable care in its maintenance of Klingle Road.

▮ The duty of the District to maintain its streets "in a condition fit for convenient use and safe against accident to travelers using them," *District of Columbia v. Woodbury*, 136 U.S. 450, 463, 10 S.Ct. 990, 995, 34 L.Ed. 472 (1890); *Joseph v. District of Columbia*, 366 F.Supp. 757 (D.D.C.1973), aff'd mem., 162 U.S.App.D.C. 19, 495 F.2d 1075 (1974), is well established. But the District argues that there was not sufficient evidence in the case at bar from which a jury could reasonably infer that the tulip poplar fell because of lack of reasonable care in performance of this duty. This argument is based primarily on the following set of contentions: (1) The Class C weekly drive-through inspection, concededly performed by the District (together with the National Park Service), was a sufficient and reasonable level of maintenance for roads in a forested area; (2) even if the jury could have concluded that the tulip poplar tree would have been observable during such drive-through inspections,[13] it could not have reasonably inferred that rot or other evidence of imminent danger would have been observable; (3) thus, the District had no actual or constructive notice [14] of the danger posed by the tulip poplar and was under no duty to remedy the defective condition of the tree.

We think this argument is based on an erroneous approach to the issue of the proper standard of care that must be exercised by the District in fulfilling its obligation to maintain public roads in a reasonably safe condition. The District would state the extent of inspection and maintenance required without regard for the type and extent of danger posed to the roadway. In effect, it simply asserts that the only dangers it need protect against are those revealed in weekly drive-through inspections as set out in the Park Service Manual. Presumably, even if the District were aware that there could exist dangers that would not be revealed on a drive-through, it would be under no obligation to avert those dangers.

▮ The essential flaw in this argument is that the appropriate level of inspection and maintenance of a particular roadway depends not only on the expense and burden of various maintenance programs, but also on the characteristics of the surrounding land and the roadway itself, including the type and extent of dangers posed thereto. *See Hensley v. Montgomery County*, 25 Md.App. 361, 334 A.2d 542 (1975). For instance, a seldom travelled roadway in a national forest in a rural area would require fewer inspections and a different type of maintenance than would a heavily travelled thoroughfare in an urban area. *Compare O'Brien v. United States*, 275 F.2d 696 (9th Cir. 1960), *with Messinger v. State*, 183 Misc. 811, 51 N.Y.S.2d 506 (1944). *See generally* Noel, *Nuisances From Land in its Natural Condition*, 56 Harv.L.Rev. 772 (1943). Thus, we think it necessary first to examine the particular situation presented in the case at bar in order to determine the level of inspection and care which the District was obligated to provide.

▮ Rock Creek Park is a prized part of the District precisely because of its uniqueness in being natural woodland situated in

---

13. *Cf.* note 4 and accompanying text.

14. Although many decisions involving municipal tort liability, and negligence generally, refer to the presence or absence of "constructive notice," this term itself sheds no light on whether the municipality should be held liable.

Whether it had constructive notice is a question of law dependent upon the level of care the municipality was obligated to provide; it is deemed to have constructive notice of all conditions of which it would have actual notice if it undertook the required level of care.

the midst of an urban area. But as well as providing undeniable beauty and majesty, forests can be sources of danger and discomfort. Indeed, this is undoubtedly a reason why forest preservations are not often found in densely populated areas. Nor is Rock Creek Park in general, nor the Klingle Valley portion of the Park in particular, isolated from the urban area surrounding it. To quite the contrary, it is crisscrossed with well traveled thoroughfares, Klingle Road being one of these. A well paved and well maintained through artery such as Klingle Road invites commuters and other travelers to utilize the road as they would any other limited access artery. We have no occasion to consider whether pedestrians, hikers, and picknickers could reasonably assume that the dangers posed by Rock Creek Park are similar to the dangers posed by other parts of their urban environment, but the record compiled in the District Court demonstrates to our satisfaction that motorists on the section of Klingle Road involved in this case could reasonably assume that the City would maintain the road in such a way as to achieve a level of safety commensurate with other thoroughfares in the District. Thus, we hold that the District of Columbia had the same duty with respect to danger posed by trees proximate to Klingle Road that it has with respect to danger posed by trees bounding other thoroughfares in the City.[15]

**15.** Courts have traditionally drawn a distinction between the standard of care owed with respect to trees in urban areas and that owed with respect to trees in rural areas. That clear distinction has become less workable with the growth of suburbs and the increase in traffic through rural countryside. *See Albin v. Nat'l. Bank of Commerce,* 60 Wash.2d 745, 375 P.2d 487 (1962); *Hensley v. Montgomery County, supra.*

**16.** That a once-weekly drive-through of a heavily wooded area might not reveal all significant dangers is not surprising. Indeed, it would seem to us that a heavily travelled road bordered by dense forest would require slower, more careful inspection than would a similar road with, for instance, a single row of trees on each side, all trees being clearly visible during a drive-through inspection.

■ The record below provides sufficient support for the jury to have concluded that the District did not exercise this standard of reasonable care with respect to the tulip poplar tree. The evidence concerning the inherent weakness of V-shaped crotches established that the danger of a stem falling is greater the heavier is the branch and the longer the length of time that passes in which the crotch is subject to rot and strain. The tree in question had not one but two V-shaped crotches, one of which supported a stem of upwards of ninety-feet that would fall directly across and totally obstruct the adjacent public roadway if it gave way.

■ Given the undeniable danger posed by tight V-shaped formations supporting enormous stems, the District had an obligation to inspect at least periodically such trees growing adjacent to its highways. Yet appellant's witnesses testified that neither the tulip poplar in this case nor any tree of similar formation and posing similar dangers was individually observed or examined to determine whether disease or weakening was occurring. Even assuming that the District is correct in its contention that inspection of the tulip poplar was not possible from a vehicle on a drive-through observation, this does not absolve the District of liability. Rather, it suggests that the drive-through observations were not sufficient to meet the standard of care required of appellant.[16]

Moreover, there is no reason to suppose that the primary consideration in the Park Service's designation of Klingle Valley Parkway as a Class C Park subject to weekly drive-throughs was safety to adjoining roadways. Rather, the Class designation appears to relate primarily to aesthetic considerations. The record discloses that Class A is reserved for areas such as LaFayette Square, which, under that designation, are highly maintained and manicured. For instance, while the Park Service might cut down a weak tree limb in a Class C area, it would more likely brace or cable such a limb in a Class A area. This variation in procedures may be quite appropriate and desirable as far as aesthetic considerations are concerned. But the *danger* posed by a weakly supported limb may be as great in a Class C area fronting on a heavily travelled road as in Class A areas. The relative level of care required for assuring a reasonable degree of safety in various park-

■ The potential dangers inherent in a situation such as that in the case at bar—where dense woods are proximate to a well travelled thoroughfare—are obvious. Certainly appellant's obligation to assure a reasonable degree of safety on its streets required that it be alert to the presence of and carefully observe at periodic intervals an enormous, multi-trunked tree that is unusually susceptible to weakening and that has a ninety-foot, overhanging stem weighing ten tons, and that it be prepared to abate such hazards as its inspections revealed.[17]

### III

In addition to serving as a thoroughfare for travelers in the City of Washington, Klingle Road is an important access route to and through Rock Creek Park. Indeed, it was in recognition of the need for an access route in this area that the federal government in 1946 bought the land adjacent to the road. While negotiations with the Government of India at that time did not result in the United States actually taking title to the tract on which the tulip poplar grew, the federal government was successful in achieving what it had initially sought to achieve through purchase: ensuring that the tract would be retained as natural woodland melding into and indistinguishable from adjoining federal parkland. The trial record amply supports the findings of the District Court that for at least ten years prior to the occurrence of the accident involved in this case, the National Park Service assumed equal responsibility with the District of Columbia for servicing and maintaining this important access route to Rock Creek Park. Moreover, Park Service employees, having staked out and marked with permanent granite monuments the tract on which the tulip poplar grew, inspected and maintained these

markers and the tract generally to the same extent as they maintained parkland actually titled to the United States. It is also apparent from the trial record that the Service used Klingle Road as a point of entry for inspection of adjacent federal parklands.

■ We think that these facts provide at least two bases for holding that the United States had an obligation to use reasonable care to protect motorists on Klingle Road from hazards posed by the tract of land on which the tulip poplar grew. The first basis for this obligation is the overt assumption of responsibility by the United States, jointly with the District of Columbia, for inspection and maintenance of Klingle Road. In participating fully, equally, and continuously with the District in performance of maintenance operations on an important access road through a National Park, the United States was under no less of an obligation to the public than was the District to maintain that road "in a condition fit for convenient use and safe against accident to travellers using [it]," *District of Columbia v. Woodbury, supra.* See *Newman v. United States*, 248 F.Supp. 669, 670 (D.D.C.1967), where it was held that the liability of United States with respect to a walkway that served as an access route to the Washington Monument and that was "controlled by the United States" was "the same as that of the District of Columbia as to its streets or highways."

■ The second basis for this obligation, which was the basis relied upon by the District Court, flows from the unique relationship which existed between the United States and the tract of land on which the tulip poplar grew. In the District of Columbia as elsewhere, an owner or occupant of land has a duty to use reasonable care to protect passers-by on adjoining public ways from hazardous trees on his land,[18] *Turner*

lands may not be commensurate with the relative level of maintenance required to achieve aesthetic objectives.

17. D.C.Code § 5–504 (1973 ed.) empowers the District to abate hazards posed "to persons or property on public space" by any "dead, dan-

gerous or diseased tree" on private property, after one week's notice to the owner of the property.

18. Decisions which have addressed the issue have generally concluded that the standard of care owed to users of adjoining public roads by

v. *Ridley*, 144 A.2d 269, 270–71 (D.C.Mun. App.1958), just as he has a "duty of common prudence in maintaining his property, including trees thereon, in such a way as to prevent injury to his neighbor's property," *Dudley v. Meadowbrook, Inc.*, 166 A.2d 743, 744 (D.C.Mun.App.1961). The duties owed in connection with the condition of land are not invariably placed on the person in whom the land is titled, but, rather, are owed by the person in possession of the land, *see Carver v. Salt River Valley, supra,* 8 Ariz.App. at 498, 446 P.2d 492; *Albin, supra,* 60 Wash.2d 489–90, 375 P.2d 487, because the occupant or possessor has supervisory control over the activities conducted upon, and the condition of, the land.

■ In the case before us, such control and supervision as there was over the tract of land on which the tulip poplar stood was exercised by the United States. The initial and subsequent surveys of the land, the agreement with India concerning the use to which it would be put,[19] placement and maintenance by the Park Service of monuments and stakes with United States insignia, and continuous Class C inspection of the tract itself as if it were federal parkland were each acts of notice to the Government of India,[20] to the District of Columbia, and to members of the public that the tract in question was within the control and supervision of the United States. We hold that having assumed such notorious and open public display of control of the tract,

the United States had a duty to exercise reasonable care in its supervision thereof, and thereby became obligated to use reasonable diligence to protect motorists on Klingle Road from hazards posed by the land.[21]

■ Having thus determined that the United States owed a duty to use reasonable care in averting hazards on the land which constituted dangers to passing motorists on Klingle Road—a duty commensurate both to the municipal obligation to assure safety of public streets, and to the obligation of the possessor of land to protect against hazards posed by his property to public roads—we must now consider whether the United States was negligent in the performance of this duty. The findings of the District Court in this regard, which are not clearly erroneous, are that

the United States of America, through the National Park Service, did not inspect the subject tulip poplar tree at any time from 1945 through the date of [*sic*] the plaintiff was injured . . . to determine whether any hazard existed by way of angulation or disease, nor did it at any time between 1945 and 1968 give consideration to cabling, bracing or removing the trunk of the tulip poplar tree. . .

Mem. Op. at 11, Brief of Appellee in Response to United States at 11a. Given the urban location of the wooded tract in question and the proximity of the tulip poplar

the possessor of land is similar to that owed by a municipality in maintaining the safety of its streets. *See Hensley v. Montgomery County, supra; Carver v. Salt River Valley Water Users' Assoc.*, 8 Ariz.App. 386, 446 P.2d 492, *vacated on other grounds*, 104 Ariz. 513, 456 P.2d 371 (1968).

19. We do not find it necessary to conclude, as the District Court did, that the United States' obligations with respect to the land arose solely and directly from the agreement between it and India concluded in 1947, which constituted an easement restraining the use of the land for the benefit of the United States. *See* Mem. Op. at 16, Brief of Appellee in Response to the United States of America at 16a.

20. The record does not indicate whether the Indian embassy ever used that part of its property bordering on Klingle Road. The presence

for over twenty years of permanent granite markers bearing United States' insignia indicates that the Indian Government did not contest the indicia of federal control over the tract.

21. This duty of reasonable care owed by the United States could be discharged either through inspection of the tract by United States personnel or ensuring that the Government of India would do so. This is consistent with the holding of the District Court that the United States was obliged "to make reasonable inspections of the tract in question and/or some arrangements with the Government of India with respect to inspection and maintenance," Mem. Op. at 16, Brief for Appellee in Response to United States of America at 16a.

tree to the heavily travelled Klingle Road,[22] we agree that this failure on the part of the United States to inspect the tulip poplar in order to protect passing motorists from the hazards posed by it constituted negligence.[23]

## IV

The only remaining issue involves the District Court's award of damages to appellee in excess of his earlier administrative claim against the United States. The Federal Tort Claims Act requires that a claimant against the United States first present his claim to the appropriate agency. The amount of this administrative claim sets the upper limit on any claim in a subsequent court action unless during the time between the filing of the administrative claim and the filing of the lawsuit there are intervening facts or newly discovered evidence "relating to the amount of the claim." 28 U.S.C. § 2675 (1970).

■ Appellee filed a claim with the Department of Interior in July, 1969, somewhat less than a year after the accident on Klingle Road occurred. He listed the injuries he had suffered, stated that he was 100% disabled, and presented a personal injury claim for $500,000.00. That claim was denied by the Interior Department on October 1, 1969. In his suit against the United States in the District Court, filed on November 5, 1969, appellees sought $2,500,-000.00 for personal injuries. We conclude that the District Court did not err in determining that a claim in excess of the administrative claim was allowable in view of "sufficient intervening facts to warrant reassessment of plaintiff's life expectancy." Mem. Op. at 17, Brief of Appellee in Response to United States of America at 17a. The court awarded appellee $975,000.00.

■ Appellant does not seriously dispute that the evidence received by the District Court amply supported its conclusion that appellee's life expectancy was greater at the time he filed suit than it had been at the time he made his administrative claim. Appellee's neurosurgeon had expressed the view in September of 1968 that appellee would not live for more than three to eight years, and testified that this remained his opinion as of March 15, 1969, when appellee was discharged from the hospital. Dr. Charles P. Duvall, who treated appellee in April of 1969, testified that he too had a negative prognosis at that time, due particularly to the constant urinary tract infection appellee suffered. However, when he again examined appellee on September 4, 1969 (after the administrative claim had been filed), Dr. Duvall was "pleasantly surprised" to find the patient much improved, both physically and mentally. He testified that these factors extended the prognosis for appellee's life expectancy. App. 1652–59. Both appellee and the professor at Georgetown University with whom he resided for two years after he was discharged from the hospital confirmed his striking improvement between July and September of 1969.[24]

---

**22.** Compare Chambers v. Whelen, 44 F.2d 340, 341 (4th Cir. 1930): "[D]anger, in the case of rural lands upon a country road, is, to say the most, a very remote one, and in view of the burden which the requirement[s] of inspection would impose, it is too remote, we think, to justify a holding that the landowner is charged with . . . [a duty] to inspect trees growing naturally upon [such] rural lands, for the purpose of determining whether, through natural processes of decay, they have become dangerous by reason of their proximity to a highway."

**23.** See also Carver v. Salt River Valley Water Users' Assoc., supra, where, in a case involving a tree that fell onto a well travelled road, the court reversed directed verdicts for both the county responsible for maintenance of the road and the private association in possession (but not ownership) of the rural land from which the tree fell.

**24.** The increase in the estimate as to appellee's lifespan occurred prior to the administrative denial of his claim on October 1, 1969. Appellant states that "it was common practice among government agencies, during the pendency of claims, to accept and entertain requests for a sum in excess of the original amount claimed." Brief of United States of America at 35 n.22. This practice has since been formally authorized, see 28 C.F.R. § 14.2(b) (1970). However, there is nothing in the record to suggest that claimants are required to take advantage of this agency practice, much less that appellee was even aware of it. In any event,

Nor does appellant challenge on appeal the sufficiency of the evidence supporting the inference that the amount of the original claim was influenced by appellee's life expectancy at that time and that the increased damage award sought in the suit was based on his greater expected lifespan as of the time the suit was instituted. *See* App. 1716–19.

■ Rather, appellant contends that because his intervening change in circumstances involved *improvement* in appellee's condition, it cannot be a basis for allowing a claim in excess of that administratively filed:

The *fact* must intervene between the claim and suit and must, where personal injury is involved, be a *fact* relating to deterioration, exacerbation or aggravation of the claimant's physical condition or a fact establishing a new condition or a permanency of a condition existing at the time the claim is filed.

Brief for the United States of America at 37.

The *ad damnum* limitation in the Federal Tort Claims Act contains absolutely no support for this position. The language of the provision requires only "intervening facts, relating to the amount of the claim," 28 U.S.C. § 2675(b). In the case before us, the intervening increase in appellee's life expectancy increased the amount of kidney dialysis and other medical treatment he would require in the future, the total amount of reduction in earning potential during his life, and the total pain and suffering he would endure. Thus, it surely constitutes "an intervening fact, relating to the amount of [his] claim" against the United States. Nothing in the statute suggests that the increase in damages sought must result from an increased assessment of the injuries suffered.

The United States' position on this appeal is essentially that "common sense . . . dictate[s] that [an improvement in] circumstances would tend to mitigate or minimize [appellee's] damages." It labels as "cyni-cal" the situation in this case, in which "the possibility of a comparatively useful life" has a "damage value greater than the dire (and misguided) 1968 forecast—that the [appellee] had an expectancy of three to eight years of relative uselessness . . . subject to an impending early death." Brief of United States of America at 36. But we do not find anything illogical or cynical about the District Court's conclusion that a severely injured person will require more resources in living for a normal lifespan, which the District Court found that appellee would obtain, than he would require were his lifespan much shorter. This case is hardly the first instance in which a tort-feasor's liability would be less were the injuries greater.

For the foregoing reasons, we affirm the judgments of the District Court. In so doing, we reject the contention that requiring inspection of trees posing the danger that this tulip poplar did will be unduly burdensome or operate to make appellants insurers of the safety of streets such as Klingle Road, *see Woodbury, supra*. Because they are subject to disease and other natural processes causing weakening, trees may come to pose significant dangers to those proximate to them. Of course, averting such dangers requires some expenditure and effort, but it does not follow that those responsible for maintaining the safety of public roadways may either ignore certain sources of danger or remain passive as hazards develop therefrom. It was established at the trial of this case that, in addition to weekly drive-through observations, the Park Service has found it necessary to make careful inspections of beech and Dutch elm trees in order to determine whether such trees are diseased. App. 607–13. We do not think it is unreasonable to require the District with respect to its streets and the United States with respect to its urban parklands bordering public roadways also carefully to inspect enormous, overhanging trees posing the danger

---

the statutory exception to the *ad damnum* provision relates to facts in the interim between

the *filing*, not the *denial*, of the administrative claim and the institution of suit.

to passing motorists of the magnitude posed by the tulip poplar tree in this case.

*Affirmed.*