**Richard ROBISON, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

No. 89–4123.

United States District Court,
D. Kansas.

Sept. 10, 1990.

Marla J. Luckert, Goodell, Stratton, Edmonds & Paller, Topeka, Kan., for plaintiff.

D. Brad Bailey, Benjamin L. Burgess, Jr., U.S. Attys., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a Federal Tort Claims Act case arising from a slip and fall from a loading dock at the United States Post Office at Manhattan, Kansas. After considering all the evidence presented at the trial of this case, the court hereby makes the following findings of fact and conclusions of law.

1. Plaintiff is 39 years old. On June 12, 1988, a Sunday, at about 11:00 or 11:30 a.m., plaintiff had finished unloading bulk mail onto the loading dock at the United States Post Office at Manhattan, Kansas. Plaintiff attempted to board the loading dock by stepping up with his right foot from the surface where his vehicle was parked. Plaintiff's right foot slipped. Plaintiff fell back and to his side. The fall severely fractured plaintiff's right arm.

2. The loading dock has a rectangular shape. The face of the dock is on the west side and is approximately 84 feet long. The north side of the dock is approximately 25 feet long. There is a bumper just in front of the dock on the west and north sides. The bumper is made of wood which is bolted to the cement dock. Approximately one inch separates the bumper from the dock. This space provides a place for water to drain from the loading dock, which is slanted toward the west for this purpose. Metal pieces cover the top of the bumper and extend two to three inches down the front and back of the bumper. The top of the bumper is six inches across. The metal covers have rounded edges as they turn down the sides of the bumper. The cement dock is approximately 25 inches high. The top of the bumper is approximately 28 inches high. Thus, the bumper serves as a stopper which prevents carts from rolling off the dock. The top of the bumper slants downward slightly, perhaps ¼ of an inch, toward the west. The bumper and the metal cover are painted yellow. It was testified that the dock follows a common design for loading docks at post offices.

3. There are stairs which can be used to board the dock at the northeast corner of the dock. There are no stairs on the face of the dock, the west side, but there is a ramp which can be used to board the dock from the west. The ramp runs along the south side of the dock. It leads directly to a customer service bell which postal patrons use to alert postal employees that a delivery of bulk mail has been made.

4. At the time he slipped, plaintiff was located near the middle of the dock and was intending to walk to the customer service bell. Although he was aware of the ramp and the stairs, he chose to try to step up on the dock because this was the most direct route to the bell. The business plaintiff helped operate at the time of his injury had a bulk mail permit. Plaintiff made five or six bulk mail deliveries a week to the Manhattan post office. Plaintiff had stepped up on the dock countless times prior to his injury. He did not consider it an unsafe or difficult maneuver. Indeed, since his injury, plaintiff still does not use the ramp or the stairs.

5. Other people who worked at plaintiff's business testified that they seldom used the ramp or stairs to board the dock when they made bulk mail deliveries. They also testified that they observed postal employees and other postal patrons stepping up on the dock. The postmaster of the post office and a postal employee acknowledged that patrons and employees did step up on the dock at times. They could not specify how frequently it happened, but the postal employee, Bernard Helget, refused to label it a "common" practice. They also testified that they witnessed postal patrons and employees using the ramp and the stairs to ascend the dock. Postal employees were warned against stepping up or down from the dock. Postal patrons were not warned or instructed to use the stairs or ramp instead of stepping directly onto the dock.

6. When plaintiff fell, he was wearing tennis shoes. The weather was clear and dry. There was no other activity at the dock—nothing which would have impeded his use of the ramp or the stairs. There was no debris or material on the dock which contributed to the fall. Plaintiff was familiar with the premises. There was no hidden defect or danger.

7. Plaintiff suffered severe pain from his fractured arm. Three surgeries were conducted on plaintiff's arm to clean the wound, set the fracture, and suture the wound. A fourth surgery was done on June 24, 1988 to close the wound. Part of plaintiff's treatment included the transplant of bone marrow from plaintiff's right

hip. Plaintiff was heavily medicated in the hospital. He does not remember much of what his doctor, Dr. William T. Jones, an orthopedic surgeon, told him. Nor does he remember some visits from friends.

8. Plaintiff has had seven office visits with Dr. Jones since his injury. The last office visit was on December 8, 1988.

9. With the assistance of a friend, plaintiff filled out an administrative claim for damages or injuries and submitted it to the U.S. Postal Service on or about July 13, 1988. The claim was for "approximately" $16,007.05. The claim notes that all of plaintiff's expenses were not totalled yet. Plaintiff did not have health insurance at the time of his injury. Plaintiff filed the claim quickly after his injury to receive help with his medical expenses.

10. The postal inspector wrote plaintiff on August 23, 1988, requesting a total dollar figure for his claim. After visiting Dr. Jones' office, plaintiff resubmitted the same form with a claim for damages in the amount of $18,233.81. We believe this was a claim for a sum certain in spite of the fact that "approximately" was still written on the claim form, as was the notation that all of plaintiff's expenses were not totalled yet. See *Erxleben v. United States*, 668 F.2d 268 (7th Cir.1981).

11. Plaintiff's claim for damages was denied by the postal inspector on October 24, 1988.

12. Prior to the decision of the postal inspector denying plaintiff's claim for damages, plaintiff had been informed by Dr. Jones of plaintiff's progress and prognosis. Plaintiff was aware that he would suffer residual pain, that some permanent impairment was possible, and that surgery in the future might be necessary to remove the metal plate and screws installed to set the fracture in June 1988. Plaintiff has had a good recovery from his fractured arm, although he suffers some permanent impairment and some residual pain. There have been no unexpected complications.

13. On December 8, 1988, plaintiff first reported pain in his arm which Dr. Jones could associate with the metal plate. Two other orthopedic surgeons, Dr. John Wertzberger and Dr. Sergio Delgado, testified that it was expected or normal to have surgery to remove the metal plate and screws years after a fractured arm has been set in someone plaintiff's age. Dr. Jones testified that he removed the plate and screws in 10 to 20 percent of his cases, but that plaintiff's report of pain made plaintiff a higher risk for such surgery. Nevertheless, plaintiff has had no medical treatment for his injured arm and no more visits with Dr. Jones since December 8, 1988.

14. Plaintiff has a permanent impairment from his injury. The impairment stems from pain, weakness, and loss of motion or flexibility. Dr. John Wertzberger testified that plaintiff had a 21% partial permanent impairment of his right upper extremity and a 13% partial permanent impairment of his body as a whole. Dr. Sergio Delgado testified that plaintiff had 13% impairment to his arm and an 8% impairment to his body. These assessments were made in 1989 and 1990. It would have been impossible in 1988 to predict what percentage of impairment plaintiff would ultimately have because the healing process was not finished.

15. Plaintiff and acquaintances of plaintiff testified that plaintiff still suffers pain; that he cannot lift as much as he did prior to the injury; that he can no longer operate a paper cutting machine at work; and that he has given up some recreational pursuits, such as softball.

16. Plaintiff continued to be paid during his recovery from the injury in the same manner that he had been paid prior to the injury, even though he missed work. Plaintiff lost no income as a result of the injury.

17. The postmaster of the Manhattan post office testified that he was aware of no other injuries or incidents similar to plaintiff's. He was also unaware of any complaints regarding the conditions at the loading dock. The postmaster has been stationed at the Manhattan post office since 1982.

■ 18. Plaintiff's prayer in this case is for $350,000.00. Defendant has asked the court to rule that plaintiff, by law, is limited to recovering no more than the amount of plaintiff's administrative claim. Defendant further asserts that the administrative claim should be the maximum amount against which any percentage of comparative fault is applied. The court believes plaintiff *is* limited in this case by the amount of his administrative claim.

19. Title 28 United States Code § 2675(b) provides:

Action under this section [the Federal Tort Claims Act] shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

The First Circuit described the purpose of this provision in *Reilly v. U.S.*, 863 F.2d 149, 173 (1st Cir.1988):

The goal of the administrative claim requirement is to let the government know what it is likely up against: mandating that a claimant propound a definite monetary demand ensures that "[t]he government will at all relevant times be aware of its maximum possible exposure to liability and will be in a position to make intelligent settlement decisions." *Martinez v. United States*, 780 F.2d 525, 530 (5th Cir.1986); *see also* S.Rep. No. 1327, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2515, 2516 (fundamental purpose of requiring an administrative claim is "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States"). As between prospective defendant and prospective plaintiff, the latter is in by far the better position to determine the worst-case scenario or, if uncertain, to paint the picture as bleakly as reason permits and conscience allows. If a plaintiff misjudges, as to matters

known or easily deducible when her claim is filed, it seems more equitable for her to bear the burden of miscalculation than to impose it on the sovereign. *Cf. Lopez v. United States*, 758 F.2d 806, 809 (1st Cir.1985) ("individuals wishing to sue the government must comply with the details of the [FTCA claim requirement]").

■ 20. It is undisputed that plaintiff could have amended his administrative claim at any time prior to the administrative decision to assert an increased amount of damages. 28 C.F.R. § 14.2(c). To reiterate, plaintiff's administrative claim was decided on October 24, 1988. A question exists as to whether the date of filing the administrative claim or the date of decision of the administrative claim constitutes the "time of presenting the claim" under § 2675(b). There is a split of authority on this point. Contrast *Husovsky v. United States*, 590 F.2d 944, 954–55 n. 24 (D.C.Cir. 1978) (date of filing the administrative claim is relevant date for statutory exception) with *Industrial Indemnity Co. v. United States*, 504 F.Supp. 394 (E.D.Cal. 1980) (date of final agency action is relevant date for statutory exception). While the object of informing the government of a claimant's claim might be better served by considering only whether there has been newly discovered evidence since the date of the agency decision, the construction of the D.C. Circuit is in better accord with the plain language of § 2675(b). "Present" means to offer, file, submit or introduce. See BLACK'S LAW DICTIONARY 1346–47 (4th ed. 1968). We believe plaintiff's administrative claim was presented when plaintiff submitted his amended claim for $18,233.81. Therefore, the issue for this court is whether plaintiff had sufficient knowledge of his damages or could have obtained such knowledge prior to September 9, 1988, that he should be limited to recovering the amount of damages sought in the administrative claim.

21. There are two possible sources of "newly discovered evidence" which arguably justify plaintiff's effort to greatly multiply his claim from one for medical

expenses to one for pain, suffering and permanent impairment. First, plaintiff alleges that he was not aware he might need additional surgery to remove the plate and screws in his right arm and could not have been made aware that the probable need for such surgery had increased until his December 8, 1988 office visit with Dr. Jones. Second, plaintiff was not aware and could not have been made aware of the extent of any permanent impairment on September 9, 1988. It was only when his injury had more time to heal that the degree of impairment could be calculated.

22. The court rejects both arguments. The court believes plaintiff knew or reasonably could have known of the possibility of future surgery prior to the decision upon his administrative claim. Dr. Jones testified that he spoke with plaintiff about the possibility of future surgery to remove the plate and screws prior to July 11, 1988. So, plaintiff must have known of the possibility of future surgery or certainly could have learned of the possibility, had he inquired of Dr. Jones, before September 9, 1988.

23. Plaintiff argues that it is unfair to treat plaintiff as if he had the knowledge and training of an orthopedic surgeon. We dismiss this contention, first, because we are convinced plaintiff was told of the possibility of future surgery, and second, because we do not believe it is unfair to require plaintiff to inquire of his doctor concerning the full consequences of his injury before filing an administrative claim. This also answers any suggestion that plaintiff's mind was too hazy from pain medication at the time he spoke with Dr. Jones to comprehend and appreciate any statements regarding the possibility of future surgery. Plaintiff's mind was clear when he made visits to Dr. Jones' office prior to September 9, 1988. He had the chance to ask Dr. Jones about the repercussions of his injury.

24. We acknowledge that Dr. Jones could not have informed plaintiff of his ultimate degree of impairment before September 9, 1988. We further acknowledge that plaintiff's odds of needing surgery to remove the plate and screws increased, in Dr. Jones' estimation, after the December 8, 1988 office visit. However, we do not consider either item to be so serious and unforeseen as to constitute newly discovered evidence which would permit plaintiff to balloon his claim for damages. In *Reilly v. U.S., supra*, the court held that the fact "that the degree of disability was uncertain was, in and of itself, inadequate to trigger the exception to § 2675(b)." There is nothing in the record to indicate that plaintiff's ultimate degree of impairment was significantly different from what was expected in his case or what would be expected in a "normal" case. Therefore, we do not consider the uncertain degree of plaintiff's impairment to warrant removing the cap on plaintiff's damages.

25. Plaintiff primarily relies upon the higher risk of future surgery as "newly discovered evidence" which justifies a departure from the administrative ad damnum. The court does not view the increased risk of surgery as so unforeseen or serious as to precipitate an upward departure from the amount of the administrative claim. Surgery to remove metal plates and screws is not uncommon for this type of injury, although it apparently is more common in the practices of Drs. Wertzberger and Delgado than in the practice of Dr. Jones. Plaintiff was aware or could have easily learned that such surgery was possible prior to September 9, 1988. Although the chances of such surgery apparently were considered higher after plaintiff's December 8, 1988 office visit, plaintiff has not yet had such surgery. Nor does it appear imminent. In essence, plaintiff is asking the court to permit plaintiff to multiply his claim for damages several times to compensate him for pain and impairment of which he was aware when he filed his administrative claim, on the grounds that when his administrative claim was presented he was not aware of a somewhat greater chance for future surgery which he has not yet had and may not have. Although on September 9, 1988, plaintiff was acting without the aid of an attorney and apparently without knowledge of the consequences of limiting his administrative claim, it appears

unfair to defendant and contrary to the intention of § 2675(b) to permit the expansion of plaintiff's claim for damages in this fashion—especially since, on the whole, plaintiff's recovery has been considered quite normal. Accordingly, the court rules that plaintiff's claim for damages must be limited to the amount of the administrative claim plaintiff filed on September 9, 1988.

26. Defendant also argues that plaintiff's claim for damages should be limited so that the amount of the administrative claim is the maximum amount against which any percentage of fault is applied under Kansas comparative fault system. This position was rejected by the Fifth Circuit in *Martinez v. United States,* 780 F.2d 525 (5th Cir.1986). The court has read Judge Higginbotham's opinion in *Martinez* and concurs with the result. We find nothing in that result which prevents the government from knowing the maximum extent of its liability when it considers an administrative claim. Accordingly, we hold that plaintiff should receive his pro rata share of damages under the comparative fault formula or the amount of his administrative claim, whichever is less.

27. Plaintiff was a business invitee at the post office. This is undisputed. The duty owed to plaintiff by defendant under Kansas law is described in *Knowles v. Klase,* 204 Kan. 156, 460 P.2d 444, 445–46 (1969):

> A proprietor must use ordinary care to keep those portions of the premises which can be expected to be used by business invitees in a reasonably safe condition. If an unsafe condition is created by the proprietor or those for whom he is responsible, or if it is traceable to their actions, proof of notice of the condition is unnecessary.... A proprietor may be charged with constructive notice of the condition if the condition existed for such length of time that the proprietor, his agents or employees should have known of it in the exercise of ordinary care.

28. As a business invitee, plaintiff also had the responsibility under Kansas law to "make reasonable use of his faculties for his own protection, and, in the interest of his own safety, ... to use that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances." *Warren v. T.G. & Y. Stores Company,* 210 Kan. 43, 499 P.2d 201, 203 (1972). Defendant was not the insurer of plaintiff's safety. *Id.* Even if a dangerous condition existed at the loading dock, defendant did not owe plaintiff a duty to eliminate the condition or warn plaintiff of the condition if the condition was open and obvious to a person exercising ordinary attention, if the danger was not extreme and if there was a reasonable alternative way open to plaintiff to avoid the danger. RESTATEMENT (SECOND) OF TORTS § 343A comment g (1965).

29. "[N]egligence in the abstract is never actionable. Actionable negligence is that which *causes* harm. In the absence of any proof of negligence or cause, an inference of both amounts to nothing more than impermissible speculation and conjecture." *Wasson v. Brewer's Food Mart, Inc.,* 7 Kan.App.2d 259, 640 P.2d 352, 357 (1982).

30. Plaintiff has charged that the loading dock was not reasonably safe because defendant knew that people stepped directly onto it without using the stairs or ramp, but defendant did not take measures which would decrease the chances of slipping or which would encourage people not to step directly onto the dock.

31. Had steps been placed at the location where plaintiff was unloading the mail on the day of his injury, plaintiff's fall would have been averted. Had steps been placed in some other location on the face of the dock, plaintiff's fall may not have been averted because plaintiff may have still tried to step on the dock. We do not believe the failure to place steps on the face of the dock created a dangerous condition. The placement of a ramp at the south end of the dock and stairs at the northeast corner provided postal patrons with two reasonable alternative means of ascending the loading dock. The placement of steps in the middle of the dock would have decreased the utility of the dock by decreasing the space available for loading and

unloading. Steps in front of the dock would have encouraged walking traffic at the front edge of the dock where loading and unloading activities occurred. The ramp leading to the customer service door discouraged such traffic, although it did require people to walk around parked trucks or other vehicles during busy hours. So, there were advantages and disadvantages to placing stairs in the middle of the loading dock. On the whole, we do not find the failure to place stairs in the middle of the dock in this case to be negligence. The design of the dock with stairs on the northeast corner and a ramp on the south side provided reasonably safe and convenient access between levels, in the court's opinion. We conclude that the dock was reasonably safe.

■ 32. Assuming that the dock presented a dangerous condition because people did not use the stairs or ramp, plaintiff further argues that the danger could have been alleviated by three measures. First, plaintiff contends that the metal top to the bumper should have been changed to a square from a rounded edge. An expert witness for the defendant testified that a square edge would provide a better grip for someone stepping up on the dock. A second area of alleged negligence was the failure of defendant to place slip resistant material on top of the bumper. Third, plaintiff asserts that the slope of the bumper contributed to plaintiff's fall. Again, plaintiff's expert explained that the slope of the bumper retarded the upward thrust of someone attempting to step onto the bumper.

33. Despite these claims of negligence, we believe plaintiff was primarily at fault for his injury. In essence, this case asks the question of who is at fault for the injury of someone misusing a facility—the injured person who knowingly misused the facility, or the facility owner who knows the facility will be misused on occasion but does not take every step to insure the safety of the misuser. We believe the person who knowingly misuses a facility must be held primarily at fault for the consequences. Here, plaintiff was aware the dock was not a step. He was fully aware of the construction and condition of the bumper in front of the dock. He was aware he could have walked a few extra yards to use a ramp on his way to the customer service bell. The potential danger of slipping from the dock was no mystery to plaintiff. So, even assuming arguendo that the dock was in a dangerous condition, we believe the condition was obvious to plaintiff and that plaintiff must be considered primarily at fault for failing to take a reasonable alternative to avoid the danger. We believe this must be our holding in these circumstances where the danger of the dock did not appear to be extreme and there were no prior injuries or incidents indicating that persons could not safely ascend the dock. *See Jackson v. Cartwright School District*, 125 Ariz. 98, 607 P.2d 975 (1980) (spectator at ball game cannot recover for falling on slippery ramp, when she knew the ramp was slippery and two other exits were open and available, although more circuitous); *Friedrich v. Department of Transportation*, 60 Haw. 32, 586 P.2d 1037 (1978) (plaintiff, who fell off a pier and was injured while attempting to step around a water puddle on a pier, cannot recover because he chose narrow more dangerous path near edge of pier instead of a twenty foot wide path on other side of puddle); *Carrender v. Fitterer*, 503 Pa. 178, 469 A.2d 120 (1983) (plaintiff cannot recover for slip and fall on an icy patch of a parking lot, when plaintiff knew icy patch existed and could have avoided it by parking at other clear and vacant parking places); RESTATEMENT (SECOND) OF TORTS § 343A comment g, illustration 7 (1965); *cf., Trowell v. United States*, 526 F.Supp. 1009 (M.D.Fla.1981) (mere forgetfulness does not excuse the failure to avoid a known peril). In sum, regardless of plaintiff's charges of negligence against defendant, we believe plaintiff is primarily at fault for failing to take reasonable, if slightly inconvenient, measures to scale a known impediment, i.e., the loading dock.

■ 34. We also hold that it was not negligence for defendant to construct and maintain the loading dock without treating it as a step. One point of plaintiff's ex-

pert's testimony was that certain measures mentioned earlier could have been taken to make the dock safer as a step. However, the expert admitted that no one would favor a 28-inch step. We find that the dock was reasonably safe without these measures and that reasonable care did not require defendant to take these measures to insure that the dock would be safer if it was misused as a step. "That someone, after an accident, can think of things which, if done, might have made the accident less likely, does not constitute proof of negligence." *Wasson v. Brewer's Food Mart, Inc., supra.* Additionally, we have no reason to believe, nor was there testimony, that a square edge on top of the bumper or a leveling of the surface would have prevented plaintiff's fall. Even the placement of steps on the face of the dock may not have prevented plaintiff's injury if the steps had been placed some distance from where plaintiff unloaded his mail. Accordingly, we do not believe these alleged problems caused plaintiff's injury.

35. Finally, we are uncertain whether a failure to warn is being alleged in this case. But, we do not consider any failure to warn as actionable negligence. Plaintiff was aware of the location of the steps and the ramp. The condition of the dock was obvious to plaintiff. Plaintiff could appreciate the danger of falling from the dock. There was no basis to conclude that defendant had a duty to warn against stepping onto the dock or that the absence of a warning caused plaintiff to slip and fall. See *Henretig v. United States,* 490 F.Supp. 398, 404 (S.D.Fla.1980).

36. In conclusion, the court holds that plaintiff has failed to prove negligence on the part of defendant. But, even if the court held that defendant was negligent for failing to take measures to discourage stepping directly onto the dock or to decrease the chance of slipping on the bumper in front of the dock, the court would hold that plaintiff was more than 50% at fault for his injury and could not recover under Kansas law because plaintiff failed to take a reasonable alternative to avoid an open and obvious danger.

37. Plaintiff's claims for relief shall be dismissed.

IT IS SO ORDERED.