Vincent William MICHELS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 4-91-CV-30096.

United States District Court,
S.D. Iowa, C.D.

March 18, 1993.

1246

Marsha Merrill Beckelman and James P. Craig of Moyer & Bergman, Cedar Rapids, IA, for plaintiff.

Asst. U.S. Atty. Christopher D. Hagen, Des Moines, IA, for defendant.

## MEMORANDUM OPINION AND ORDER

BENNETT, United States Magistrate Judge.

This personal injury lawsuit for damages arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671–80. On March 9, 1989, in Ames, Iowa, during his freshman year at Iowa State University, Plaintiff Vincent William Michels was riding his motorcycle when he was involved in an accident with a motor vehicle driven by Dr. Iqbal Ahmed. Dr. Ahmed was in the scope and course of his employment with the United States Department of Agriculture. Michels was seriously injured. The trial, where liability was not seriously disputed by the United States of America, raised two primary issues. First, the extent of Michels' damages. Second, whether Michels may amend his FTCA tort claim notice pursuant to 28 U.S.C. § 2675(b) and receive a sum in excess of the $450,000.00 amount claimed in the notice.

## I. INTRODUCTION AND BACKGROUND

It is axiomatic that the United States is immune from suit unless it has consented to be sued. *United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979); *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). The United States Supreme Court has held that Congress may impose those conditions on a waiver of sovereign immunity as it deems appropriate. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). The FTCA "is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private person for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976); *see also Layton v. United States*, 984 F.2d 1496, 1499 (8th Cir.1993); 28 U.S.C. § 2674.[1] Prior to the FTCA's passage in 1946, the doctrine of sovereign immunity barred those victims of negligence by federal employees acting within the scope of their employment from seeking redress through litigation. *Molzof v. United States*, —— U.S. ——, ——, 112 S.Ct. 711, 714, 116 L.Ed.2d 731 (1992). The only option for compensation open to those so injured by federal tortfeasors was through passage of a private bill by Congress. *Id.* The private bill route, however, was an exceedingly "clumsy" remedy. *Dalehite v. United States*, 346 U.S. 15, 24–25, 73 S.Ct. 956, 962, 97 L.Ed. 1427 (1953). The FTCA was "the offspring of a feeling that the Government should assume the obligation to pay damages for the misfeasance of employees in carrying out its work." *Id.* The provisions of the FTCA are to be liberally construed. *United States v. Yellow Cab Co.*, 340 U.S. 543, 554, 71 S.Ct. 399, 406, 95 L.Ed. 523 (1951).

This action was originally commenced in state district court in Story County on October 9, 1989 by Vincent Michels and his par-

---

1. 28 U.S.C. § 2674 provides, *inter alia:*
 The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individuals under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

ents, Raymond and Lorraine Michels, against Iqbal Ahmed, individually.[2] On February 25, 1991, the United States filed a certification pursuant to 28 U.S.C. § 2679(d)(1) that Defendant Iqbal Ahmed was acting within the scope of his office or employment at the time of the incident out of which the claim arose, thereby substituting the United States as the sole party defendant. On the same date, February 25, 1991, the United States filed a notice of removal to this court pursuant to 28 U.S.C. § 2679(d)(2).

On September 19, 1990, pursuant to 28 U.S.C. §§ 2401(b) and 2675, Michels filed a tort claim notice pursuant to the FTCA with the United States Department of Agriculture. The FTCA tort claim notice must be presented to the appropriate federal agency within two years after the claim accrues. 28 U.S.C. § 2401(b); *Mora v. United States,* 955 F.2d 156, 160 (2d Cir.1992). The presentment of the tort claim notice is a prerequisite to the institution of a civil suit under the FTCA. 28 U.S.C. §§ 2401(b) and 2675(a); *Mora,* 955 F.2d at 160. Michels indicated in his FTCA tort claim notice that the amount he was seeking for his personal injuries arising from the motor vehicle/motorcycle accident was $450,000.00. Title 28 U.S.C. § 2675(b) states:

> (b) Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

On September 10, 1992, Michels moved to amend his FTCA tort claim notice. The motion was resisted by the United States. The issue was fully and well briefed by both parties. On September 29, 1992, following a hearing, this court entered an order deferring Michels' motion until after trial. The court determined that, after hearing the evidence at trial, the court would be in a much better position to determine whether Michels falls within the "newly discovered evidence" or "intervening facts" exceptions contained in 28 U.S.C. § 2675(b).

On January 12, 1993, trial commenced before the undersigned pursuant to the consent of the parties under 28 U.S.C. § 636(c) filed March 24, 1992. Post-trial briefs were filed by Michels on January 25, 1993, and by the United States on January 29, 1993. This matter is now fully submitted.

## II. FINDINGS OF FACT

### A. Vincent William Michels

Vincent Michels is twenty-three years old. At the time of the accident, he was nineteen. Michels was raised on the 580 acre family farm in northeast Iowa near Stanley and Oelwein. Michels is one of seven children. He has three brothers and three sisters. He is the youngest son. None of his siblings now work on the family farm or ever expressed an interest in taking over the family farm from their father, Raymond Michels. The farm has been in the Michels family since 1917. Michels' father has farmed it continuously since 1953.

Michels graduated from Oelwein Community High School in 1988. While in high

---

**2.** Plaintiffs' initial state court petition pled a cause of action for Raymond and Lorraine Michels' loss of consortium for their adult son Vincent. At the time this lawsuit was filed in state court, the Iowa Supreme Court had held that neither common law nor Iowa Rule of Civil Procedure 8, entitled "Injury of Death of a Minor," allowed a parent to recover damages for loss of consortium of an injured or deceased adult child. *Miller v. Wellman Dynamics Corp.,* 419 N.W.2d 380, 383 (Iowa 1988). The court in *Miller,* however, held that the Millers' equal protection constitutional challenge to Iowa Rule of Civil Procedure 8 was not properly before the court because it was not presented to the district

court. *Id.* at 384. By the time this case was removed to the United States District Court for the Southern District of Iowa on February 25, 1991, the Iowa Supreme Court had rejected the equal protection constitutional challenge to Rule 8. The court in *Ruden v. Parker,* 462 N.W.2d 674, 675–77 (Iowa 1990), held that the equal protection rights of parents of adult children were not violated by Iowa Rule of Civil Procedure 8 which permitted only parents of minor children to recover for loss of consortium. When this action was removed, the state district court had already disposed of Vincent Michels' parents' claim.

school Michels was active in 4–H and the Future Farmers of America. He was not active in other extracurricular activities because he worked extensively on the family farm. While in high school, both before and after school, Michels engaged in extensive chores concerning all aspects of the family farm. He also raised feeder pigs.

Michels enrolled at Iowa State University ("ISU") in the fall of 1988. He majored in agricultural business. His goal was to help his dad farm and eventually take over the family farm.

Michels is an industrious young man. He was able to finance his college education at ISU by receiving various grants and loans as well as going home every weekend, holidays and academic breaks to work on the family farm with his father. Michels would frequently come home on Friday afternoons to begin his weekend of work on the family farm. In the spring semester of 1989 Michels also worked in the food service at his dormitory at ISU.

### B. The March 9, 1989 Accident

March 9, 1989, was a clear, sunny day in Ames, Iowa. Sometime after 2:00 p.m., Michels went to check his midterm chemistry grade. Michels was riding his Honda 750cc Nighthawk motorcycle. He was not wearing a helmet.

Michels was proceeding north and Dr. Ahmed south on Welch Avenue in Ames. Welch Avenue is a two-lane street with a north and southbound lane. Michels' motorcycle headlight was on. It automatically turned on when the Honda motorcycle started. As Michels was proceeding north on Welch, he observed two cars approaching in the southbound lane. The first car passed Michels without incident. The second car, a yellow station wagon, was driven by Dr. Ahmed. Dr. Ahmed attempted a left turn across the northbound lane into a private driveway to turn around. As Dr. Ahmed proceeded with his left turn, Michels' motorcycle struck the right front panel of Dr. Ahmed's station wagon. The impact occurred at the curb line where the private driveway met the northbound lane of Welch Avenue.

Prior to and during Dr. Ahmed's left turn, Dr. Ahmed had an unobstructed view of Michels' northbound lane of traffic. Unfortunately, Dr. Ahmed saw neither Michels nor his motorcycle and, therefore, took no action to avoid the accident. Dr. Ahmed was so close to Michels' motorcycle when he made the left hand turn that Michels had no opportunity to take successful evasive action.

The speed limit on Welch Avenue in this residential area was twenty-five miles per hour. Neither Dr. Ahmed nor Vincent Michels was speeding. At the time of the accident Dr. Ahmed was returning to his home in Sioux City after attending a meeting for his employer, the United States Department of Agriculture. Dr. Ahmed is a veterinarian for the USDA and is employed as a circuit supervisor supervising inspections at meat packing and slaughter houses in northwest Iowa. Dr. Ahmed was looking for the University Bookstore where he understood he could purchase a pair of nylon pants to use while working in the slaughter houses. Dr. Ahmed was lost and unfamiliar with this area of Ames. The United States conceded in its answer and the court finds that Dr. Ahmed was an employee of the United States of America at the time of the accident and he was acting in the scope of his office and employment.

Upon collision, Michels flew over the handlebars and Dr. Ahmed's station wagon, traveled between ten and twenty feet in the air, did two mid-air somersaults and landed on his back. Taylar Donnely, a fellow student at ISU and one of the first individuals on the scene following the accident, immediately observed that Michels' left leg was broken and a large portion of flesh was missing from his right leg. He was bleeding profusely from a large gash on his chin. Ms. Donnely elevated his head because she was concerned Michels would swallow his own blood.

Two independent eyewitnesses testified at trial. Taylar Donnely indicated Dr. Ahmed's station wagon turned suddenly and without warning into Michels' lane of traffic. Robert Dennison corroborated Ms. Donnely's testimony. Donnely, Dennison, Michels and Dr. Ahmed all testified concerning how the acci-

dent occurred. Their testimony was very similar and all corroborates this court's finding that Dr. Ahmed turned into Vincent Michels' lane of traffic and caused the accident.

The only real fact dispute concerning the cause of the accident is whether Dr. Ahmed's left turn signal was on. The court need not determine whether Dr. Ahmed's left turn signal was on because this fact is irrelevant to Dr. Ahmed's fault.

An ambulance arrived at 2:13 p.m. to transport Michels to the hospital. Michels was semi-conscious and screaming about his pain as he was placed in the ambulance.

### C. Michels' Physical Injuries

#### 1. Initial Emergency Room Examination

Michels was transported to Mary Greeley Hospital where he was first examined by Drs. Charlotte Cleavenger, Scott Huebsch and Allen Lang. Upon admission to the emergency room, Michels was diagnosed with an open fracture of the left tibia and fibula, a fracture dislocation of the left hip, lacerations on the right leg and chin and thoracic contusions. The leg injuries were described by Dr. Cleavenger as "extensive deformity of the left lower leg and an extensive laceration of the right lower leg." Dr. Huebsch described the one and one-half inch chin laceration as going "through subcutaneous tissue and muscle down to periosteum. . . ." [3] The left leg fractures were open, compound and comminuted.[4]

Michels' left hip was dislocated and fractured. The hip was dislocated when the ball came out of the socket joint. It was also fractured as a result of a portion of the ball being sheared off as it became dislocated. A large moon shaped piece of bone was frac-

tured off the ball and remained in the socket when the remainder of the ball dislocated.

#### 2. The Initial Surgeries

Michels was in surgery from 5:00 p.m. until 8:20 p.m. on March 9, 1989. Dr. Lang performed the orthopaedic aspects of the surgery. Dr. Huebsch performed surgery on Michels' chin. He was placed under general anesthesia and the left hip was manipulated and reduction (repositioning to normal anatomical alignment) was attained. To set his left leg fracture, interconnecting rods were placed on the outside of his leg and three pins were inserted through his lower left leg to attach the interconnecting rods. This did not allow for proper alignment so an additional pin was placed into the tibia.

The laceration in Michels' right leg was nine to ten inches long and "hockey stick" in shape. The laceration also went down to the periosteum and was contaminated with foreign material. This wound required irrigation and manual debridement and excising of necrotic skin.

Two days following the surgery on March 11, 1989, Michels developed a fat embolism, a life-threatening complication.[5] Michels was transferred to the intensive care unit and placed on oxygen. At the time he was transferred to the intensive care unit, the physician on duty noted that Michels was suffering from "severe hypoxemia".[6] Michels recovered from his fat embolism and two days later was transferred from intensive care to his regular hospital room on the surgical floor.

Michels required additional surgery on March 14, 1989 to apply a single leg spica cast.[7] The cast extended from Michels' mid-

---

3. The periosteum is a thick fibrous membrane covering the entire surface of a bone. Stedman's Medical Dictionary 1168 (25th ed. 1990).

4. The description of "open and compound" refers to the fact that the tibia (large) and fibula (small) leg bones penetrated the muscle and skin so they were open and exposed to the outside. "Comminuted" means a break in which the bone is broken into several pieces. Stedman's Medical Dictionary 617, 618 (25th ed. 1990).

5. This is a condition that may occur in patients suffering multiple trauma or multiple fractures.

Bone marrow fat leaks into the circulatory system. The fat clogs the lungs, resulting in decreased oxygen in the blood. It can result in low oxygen supply to the brain and can be fatal.

6. "Hypoxemia" is subnormal oxygenation of arterial blood. Stedman's Medical Dictionary 756 (25th ed. 1990).

7. "Spica" is a Latin word meaning ear of grain. Spica casts use successive strips of material which overlap slightly in a V shape to resemble an ear of grain. Stedman's Medical Dictionary 171 (25th ed. 1990).

chest to his pelvis and down the left leg to the left foot. The spica cast weighed 85 to 100 pounds.

Michels was essentially bedridden during his entire hospital stay. Prior to Michels' discharge, a diagnosis of cerebral concussion was noted. Michels was discharged from the hospital on March 24, 1989, fifteen days after the accident.

### 3. Michels' Discharge Home

Michels was unable to afford transportation home by ambulance. His parents rented a van and transported him to their home on the family farm. In addition, they rented a hospital bed, stool riser, reclining wheelchair (due to the full body cast), bedpan and crutches. The family rearranged their living room so it could be used as Michels' bedroom during his recovery.

The hospital bed and stool riser were necessary because the spica body cast immobilized Michels' left leg so very little bending of the trunk was possible. Due to the weight of the spica body cast, it was not possible to get up from a low position. In order for Michels to get up to a standing position or to get into a wheelchair he had to start from a high position. This meant utilizing a hospital bed which could be raised and lowered. This is also why it was necessary for Michels to use a stool riser. This made it possible for Michels to sit on the stool and get up again.

Michels was bedridden during his first three weeks at home. Michels' mother, Lorraine, functioned as a full-time, in-home nurse. Lorraine assisted Michels in urinating and cleansed him after bowel movements. She gave him sponge baths, back rubs, prepared his meals and fed him.

On April 25, 1989 Dr. Lang removed the spica body cast and a shorter cast was placed on Michels' left leg that ran from his knee to his toes. On August 15, 1989 Dr. Lang removed the interconnecting rods and pins from Michels' left leg. His left leg was placed in a walking cast. On October 24, 1989, approximately seven and one half

months after the accident, Dr. Lang removed the walking cast on Michels' left leg.

In July, 1989 Michels began walking indoors with crutches.

### 4. Michels' Subsequent Surgery

On May 8, 1990, approximately fourteen months after the accident, Michels had his ninth follow-up appointment with Dr. Lang. It was at this appointment Dr. Lang first diagnosed a possible non-union of the left fibula. This diagnosis was supported by x-rays of Michels' left leg and ankle. Two pieces of bone of the fibula were properly aligned but had not properly united. The normal healing process involves a growth of fibrous tissue between the fractured pieces of bone and gradual calcification. In Michels' case, this process had not occurred. Dr. Lang testified and the court finds the non-union fracture was unusually painful for Michels.

Dr. Lang's clinical notes of May 8, 1990 indicate Michels "has been trying to work at the farm, but has very poor tolerance for activity. He states he only operates a tractor at 30–45 minutes comfortably before he gets pain in the leg, which seems to be worse in the hip. Has trouble climbing ladders or climbing on or off equipment due to the pain around the ankle...."

Michels and his father came to the conclusion that unless he made substantial progress, Michels would be unable to fulfill their mutual dream of farming with Raymond and taking over the family farm. At this point in his recovery, Michels described that each step felt "like jabbing a knife into my heel."

Dr. Lang's diagnosis of non-union of the fibula was confirmed by a tomogram on May 29, 1990.[8] Michels was admitted to the hospital on June 25, 1990 for additional surgery to repair the non-union of his left fibula. This involved a bone graft from Michels' left pelvic bone. A window of hard bone was chiseled from Michels' left pelvic bone so soft bone could be removed to use as a bone graft on his left fibula. The soft bone was then grafted to Michels' left fibula and secured in

---

**8.** A tomogram is a special x-ray which shows cross-sections of the bone rather than the whole bone.

place with a metal plate and five screws. Michels was discharged from the hospital on June 29, 1990. Michels still has the plate and screws in his left leg.

### 5. Michels' Physical Scars

Four years later, Michels bears significant physical scars as a result of the accident. Plaintiff's Exhibits 12 through 15 are photographs which reveal the pronounced scars on his chin, left ankle, right leg and left hip. The court also had the opportunity to view Michels' chin and right and left leg scars. The scar on Michels' face is very prominent. It runs from slightly below his lip to the bottom of his chin and is approximately one and one-half inches in length. Michels' scar on his right leg is approximately nine to ten inches in length. Michels' scar on his left leg is approximately five inches in length, from the top of the ankle to his calf. Additionally, there are scars where each of the pins was inserted in conjunction with the inter-connecting rods in Michels' initial surgery. Michels' scar on his left hip is approximately three inches in length. Each of Michels' scars discussed above is very prominent. Michels is very embarrassed by these scars and, as a result, does not wear shorts, even around his family.

### D. Michels' Future Surgeries

The record evidence establishes, to a reasonable medical certainty, that Michels will need additional surgery on his ankle, knee and hip. Michels also testified that if financially able, he would elect to undergo scar revision surgery for the prominent facial scar on his chin.

### E. Past and Future Physical and Mental Pain and Suffering

As a result of Michels' injuries arising from the March 9, 1989 accident and his subsequent surgeries and treatment, Michels has suffered substantial past physical and mental pain and suffering. Michels will also incur in the future substantial physical and mental pain and suffering as a result of his injuries and physical scars. Michels will also incur additional future physical and mental pain and suffering as a result of his need for further surgery on his ankle, knee, hip and, to a much lesser extent, from his scar revision surgery on his chin.

### F. The Government's Independent Medical Examinations of Michels

At the government's request, Michels underwent two medical examinations by physicians selected by the United States. The first evaluation was conducted by Dr. John Callaghan on February 4, 1992. Dr. Callaghan is on staff at the Department of Orthopaedic Surgery at Veterans Hospital in Iowa City and is an associate professor in the Department of Orthopaedics at the University of Iowa College of Medicine in Iowa City. Dr. Callaghan observed mild arthritis in Michels' left knee which he believed was related to Michels' cruciate ligament injury and instability resulting from the 1989 accident. Dr. Callaghan also observed "mild degenerative changes" in Michels' left ankle joint. Dr. Callaghan's recommendations are as follows:

> In light of the possibility of aseptic necrosis of the left femoral head, the patient may need to undergo a total hip replacement at some time in the future. He is also predisposed to degenerative joint disease of the left hip. He may well also [sic] degenerative arthritis in the left knee and ankle from the trauma which may require a knee replacement and possible ankle arthrodesis at some point. The patient's injuries were discussed with him in detail and his questions were answered to the best of our ability. We plan to see the patient back in clinic on a PRN basis.

The second medical examination took place at the National Hospital for Orthopaedics and Rehabilitation in Arlington, Virginia, on November 4, 1992. This examination was conducted by Dr. Virgil Balint, Chief of Physical Medicine and Rehabilitation at the National Hospital for Orthopaedics and Rehabilitation. Dr. Balint is board certified in physical medicine and rehabilitation.

Dr. Balint's evaluation included the following:

> It is my opinion that this patient is at a high risk for developing post-traumatic arthritis of his left hip, left knee and left ankle. The patient is still at risk of devel-

oping a septic [sic] necrosis of his left hip. If this happens, the patient will require a total hip replacement. In order to better assess his left hip situation, I would recommend an MRI of the hip. As far as his left knee is concerned, this patient will continue to have this instability of the knee due to the posterior cruciate ligament injury and I think the patient will need a rotational brace in order to in [sic] involved in any sports activities.

As far as the left ankle is concerned, he will continue to develop osteoarthritis and most likely will end up needing triple arthrodesis.

Dr. Balint also calculated an impairment rating for Michels. He concluded as follows:

I have used the guides for the Evaluation of Permanent Impairment, Third Edition, in order to compute his impairment rating. Basically I have gotten an 18 percent impairment rating of the lower extremity from his ankle, a 15 percent impairment of the lower extremity from his knee injury and a 45 percent lower extremity impairment from his left hip. By combining these values, I have gotten a 62 percent lower extremity impairment. This 62 percent impairment represents a 25 percent impairment of the whole person.

## G. Michels' Physical Impairment

The court adopts the above findings of Dr. Balint regarding Michels' physical impairment. The court further observes that Michels' physical impairment is permanent. Michels walks with a very severe limp. He walks extremely slowly and with a substantially impaired gait. Michels' permanent physical impairment severely limits his involvement in a wide variety of physical activities. For example, Michels can no longer play basketball, volleyball or any physical sport or recreational activity which requires running, jumping, twisting, turning or requires good balance or walking on uneven ground. Michels has difficulty standing or walking for any period of time. Thus, Michels can no longer play golf or enjoy rabbit and pheasant hunting with his father and friends. He can walk up and down stairs only with great difficulty and severe pain.

Unfortunately, he also has difficulty sitting for any period of time and, therefore, is required to constantly change positions. Thus, Michels cannot engage in such simple pleasures as watching a movie. Moreover, Michels' physical condition is worsening. Michels incurs more pain and stiffness and finds certain physical activities more difficult than just a year ago.

## H. Facts Relevant to Michels' FTCA Tort Claim Notice

On September 19, 1990, Michels, with the assistance of his present attorneys, filed his FTCA tort claim notice with the United States Department of Agriculture pursuant to 28 U.S.C. § 2675. The claim was presented on standard form no. 95, pursuant to administrative regulations by the Department of Justice. Responses to the form were thorough. For example, in response to question 13, *"State nature and extent of injury which forms the basis of claim"* Michels responded as follows:

1. Open fracture of left lower leg
2. Left knee dislocation; possible future surgery required because of ongoing problems with slippage in socket
3. Fracture and dislocation of leg hip
4. Extensive lacerations to right lower leg
5. Lacerations to face; very deep laceration in chin
6. Extensive deformity of the left lower leg
7. Extreme pain in left hip, ankle and leg continuing to present
8. Complications during first hospitalization due to bone marrow and blood stream which required oxygen, blood transfusions and treatment in intensive care
9. Abrasions and contusions near abdomen and on chest
10. Severe hypoxemia and fever during first hospitalization
11. Bruised ribs, bruised hands, and head
12. Comminuted and compound fracture of left ankle, including distal left fibia and distal left fibular shaft

13. Chipped tooth

14. Soreness in chin to date

15. Continuing soreness in ankle and leg

16. Second surgery required for left ankle on June 25, 1990, and included bone graft and insertion of steel plate. Leg cast required for minimum 6 week period of time.

17. Permanent scarring to chin, knee, abdomen, right calf, left ankle, and left hip

Please see attached medical expense summary with supporting itemized bills and receipts, as well as Mr. Michels' medical records. Dr. Allen Lang, Mr. Michels' treating physician, is in the process of preparing a separate written report which will be forwarded in the near future. Dr. Lang's report will also contain a statement of estimated costs for future treatments, based on Mr. Michels' prognosis at the time of the report. Mr. Michels has included copies of other physician's reports in the enclosed medical records and will make available copies of other physician's reports, if any, subsequent to filing this claim.

Mr. Michels has incurred and will continue to incur medical expenses including, but not limited to, hospital, doctor and nursing expenses, health care equipment charges, and physical therapy expenses, past and future. Mr. Michels has lost tuition and room and board expenses due to his inability to complete the spring 1989 semester at Iowa State University. He will have to incur an additional semester's tuition in order to complete his undergraduate education. This is in addition to other permanent economic losses associated with the injuries received in the collision. For example, Mr. Michels has been unable, due to his injuries, to perform farm work and he is entitled to the lost value of the income. (See attached damages and lost earnings summaries.)

Mr. Michels is entitled to damages for pain and suffering, temporary and permanent physical disability, lost earnings, lost education expenses, lost earning capacity, loss of enjoyment of life, and for other permanent and economic losses associated with Mr. Michels' injuries.

Question 10 on standard form 95 asks the amount of claim (in dollars) for property damage (10a); personal injury (10b); wrongful death (10c); and total (10d). Michels indicated "N/A" for property damage, "$450,-000.00" for his personal injury and also indicated the same amount, "$450,000.00" for the total of his claim.

On September 21, 1990, two days following Michels' attorneys signing (and presumably mailing) his FTCA tort claim notice pursuant to 28 U.S.C. § 2675(b), Michels' primary treating orthopaedic surgeon, Dr. Lang, sent Michels' attorneys an updated medical report. This was approximately three months following Michels' second hospitalization for bone grafting and plating of his lower left leg. After summarizing Michels' treatment, Dr. Lang stated as follows:

[i]n regard to permanency, it is certain Mr. Michels will have some, but the extent remains unknown. Fracture dislocations of the hip associated with femoral head fractures, such as he had, do have a significant incidence of post-traumatic arthritis. However, this may be fairly delayed in onset or in development of very restrictive symptoms. The loss of blood supply is another complication of hip dislocations. However, this is usually evident within 18 months of the injury, and he has not shown signs of that up to the present time. It is likely that he will have some permanent degree of stiffness in that hip and ankle. In addition, the ligamentous laxity present in the knee will be permanent, as well.

No further surgical treatment is contemplated in the foreseeable future. However, if he did have significant problems with the hip in the future, a hip arthroplasty may be necessary. The ligament injury in the knee involves a permanent sprain of the posterior cruciate ligament and some posterior laxity. As such, it will likely continue to interfere with activities involving sudden stopping, jumping, running, or large amounts of leaning forward with the knee extended. I feel it is unlikely that symptoms for this would be sufficient enough to warrant reconstructive surgery, although it may require modification of his

activities. No further surgery would be expected for the lower leg.

Once his leg is sufficiently rehabilitated, no further formal physical therapy is likely to be needed. There may be a need for medications such as anti-inflammatories or analgesics, depending upon symptomatology. I expect he would be able to crop farm satisfactorily, although with some symptoms. However, he may be somewhat limited to his ability to regularly handle livestock. Other work activities which might impose similar stresses on the leg would also be poorly tolerated, as would any work duties requiring climbing or prolonged periods of walking or standing.

On January 7, 1992, Dr. Lang provided Michels' lawyers with the following updated medical report:

Mr. Michels was seen again on January 7, 1992, and I have included a copy of the office notes from that visit. His range of motion, knee instability, and numbness are documented in those notes. According to the *AMA Guide to the Evaluation of Permanent Impairment, Third Edition*, these findings warrant a forty-seven percent permanent physical impairment of the lower extremity.

It remains my impression that surgical treatment at the ankle is likely necessary in order to relieve his symptoms. I have again recommended a diagnostic and therapeutic trial of repeat injection. Should surgery at the tendons about the ankle be necessary, I think an arthroscopic evaluation of the ankle would be prudent under the same anesthesia.

His hip x-ray looks quite good. Therefore, any need for hip surgery for post-traumatic arthritis would likely be in the more distant future.

The problem with instability of the knee remains an enigma. At this point his ankle symptoms supersede anything in regards to his knee, and the ankle should be dealt with initially. As I mentioned previously, the necessity for attempting to stabilize the knee would depend on his functional desires and the functional requirements of his work. Until that is established and/or he indicates a greater intention in increasing his activity level, I do not believe knee surgery need be contemplated.

On September 21, 1990, Dr. Lang indicated Michels would have some permanency of his injuries but the extent remained unknown. On December 18, 1992, Dr. Lang testified (by deposition) that there was now x-ray evidence of arthritis in the hip that did not exist in September 1990. Thus, in December 1992, Dr. Lang now believed Michels' hip would degenerate "to the extent that it will be quite incapacitating and then would warrant hip replacement." Dr. Lang's September 21, 1990 report indicates Michels' hip at that time had shown no loss of blood supply. Moreover, loss of blood supply is usually evident within 18 months of the injury. Thus, the hip replacement was not contemplated unless Michels had "significant problems with the hip in the future." In September, 1990 there was simply no indication from Dr. Lang that Michels would have significant problems with the hip in the future. Unfortunately, by December 1992, it was inevitable that Michels would require at least one hip replacement in the future. Thus, the court finds that in September of 1990, Michels did not know he would require a hip replacement. While at some point after September 1990, Michels learned he may need a hip replacement at some distant time in the future, it wasn't until 1992 that Michels learned a hip replacement would take place perhaps a decade or more earlier than he once thought. At the time Michels filed his FTCA tort claim notice he did not know he would need a hip replacement and that fact could not reasonably have been discovered by him at the time of the filing of the notice.

In February of 1992, Dr. Callaghan, who performed the independent medical examination for the United States, informed Michels for the first time that degenerative arthritis in the left knee and ankle might require a knee replacement and possible ankle arthrodesis.[9] This was unknown to Michels and

9. Arthrodesis is "[t]he surgical fixation of a joint by fusion of the joint surfaces." Dorland's Illus-

could not reasonably have been discovered by him at the time of the filing of his FTCA tort claim notice.

In September 1990, Dr. Lang indicated Michels would be able to crop farm. By December 18, 1992, Dr. Lang testified Michels could only crop farm with difficulty. The court concludes that Michels' difficulty in getting on and off farm equipment, lifting heavy objects, being able to ride on farm equipment for an extended period of time, difficulties with balance due to his leg injury and problems with walking on irregular surfaces or rough ground, means Michels is unable to crop farm. Because his condition will not substantially improve he will be unable to crop farm in the future. This conclusion, that Michels is unable to crop farm, is also based on Michels' own testimony, the testimony of his father regarding Vincent Michels' difficulties in attempting to crop farm and the testimony of Roger F. Marquardt, Michels' vocational rehabilitation expert. The fact that Michels is unable to crop farm was unknown to him and could not reasonably have been discovered by him at the time of the filing of his FTCA tort claim notice.

## III. CONCLUSIONS OF LAW

*(Including Some Additional Findings of Fact and Ultimate Findings of Fact)*

### A. Liability

■ As 28 U.S.C. § 2674, in conjunction with the jurisdictional grant over FTCA cases in 28 U.S.C. § 1346(b), makes clear "the extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof v. United States,* —— U.S. ——, ——, 112 S.Ct. 711, 714, 116 L.Ed.2d 731 (1992); *see, e.g., United States v. Muniz,* 374 U.S. 150, 153, 83 S.Ct. 1850, 1852, 10 L.Ed.2d 805 (1963); *Richards v. United States,* 369 U.S. 1, 6–10, 82 S.Ct.

585, 589–91, 7 L.Ed.2d 492 (1962); *Rayonier, Inc. v. United States,* 352 U.S. 315, 318–19, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957); *Indian Towing Co. v. United States,* 350 U.S. 61, 64–65, 68–69, 76 S.Ct. 122, 124, 126, 100 L.Ed. 48 (1955); *United States v. Aetna Casualty & Sur. Co.,* 338 U.S. 366, 370, 70 S.Ct. 207, 210, 94 L.Ed. 171 (1949). Because Dr. Ahmed's alleged negligent act giving rise to liability occurred in Iowa, Iowa law governs the substantive law to be applied herein, including the measure of damages to be awarded. *Prior v. United States Postal Serv.,* 985 F.2d 440, 441–42 (8th Cir.1993).

■ Michels has alleged Dr. Ahmed acted negligently in turning the automobile he was driving into the path of Michels' motorcycle. The United States did not seriously dispute in its opening statement, presentation of evidence, closing argument or post trial brief that Dr. Ahmed's actions were negligent, nor could it. There simply is no shred of evidence in the trial record to support any conclusion other than that Dr. Ahmed was negligent. The court finds Michels has established, by a preponderance of the evidence, that Dr. Ahmed operated his automobile on the date in question in a negligent manner by turning the vehicle into the path of Michels' motorcycle. Specifically, in executing his left turn Dr. Ahmed failed to yield the right-of-way to Michels in violation of Iowa Code section 321.320.[10] The court further finds, pursuant to Iowa Code section 668.1, that Dr. Ahmed was 100 percent at fault for the accident. Finally, the court finds Dr. Ahmed's negligence in the operation of his automobile is the proximate cause of Michels' injuries suffered in the accident or flowing from it.

### B. Damages

■ The court, having determined liability, must consider Michels' damage claims.

---

trated Medical Dictionary 146 (24th ed. 1965).

**10.** Iowa Code section 321.320 provides that:

The driver of a vehicle intending to turn left within an intersection or into an alley, private road or driveway shall yield the right of way to

all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard, then said driver, having so yielded and having given a signal when and as required by this chapter, may make such left turn.

The plaintiff in an Iowa negligence suit may recover for past and future medical expenses, past and future physical and mental pain and suffering, past and future loss of full mind and body, loss of earnings, and loss of future earning capacity. *See generally Gavlock v. Coleman*, 493 N.W.2d 94, 98–99 (Iowa Ct. App.1992). The United States conceded in their post-trial brief that there "is no doubt that Vincent William Michels sustained severe injuries.... [which] changed Vincent William Michels' life." Def. Post–Trial Brief filed January 29, 1993, p. 1.

Michels has demonstrated to a reasonable medical certainty that he will require surgery and medical care in the future for his ankle, knee, hip and chin. He, therefore, has made the predicate showing required for recovery of future injury. *See, e.g., Stanley v. State*, 197 N.W.2d 599, 607 (Iowa 1972) (future medical expenses); *Zach v. Morningstar*, 258 Iowa 1365, 1371, 142 N.W.2d 440, 444 (1966) (future surgical expenses); *Mercer v. Ridnour*, 218 N.W.2d 625, 627 (Iowa 1974) (future pain and suffering); *Marbrier v. A.M. Serv. Corp.*, 161 N.W.2d 180, 183 (Iowa 1968) (future pain and suffering).

Each element of damages that Michels claims will be considered separately below.

### 1. Past Medical Expenses

■ Under Iowa law, Michels is entitled to the reasonable value of necessary medical care from the accident to the present date. *See Cowan v. Flannery*, 461 N.W.2d 155, 156 (Iowa 1990). The court finds Michels has established reasonable past medical expenses in the sum of $26,565.86.[11]

### 2. Future Medical Expenses

■ Michels may also recover for the present value of reasonable and necessary

medical expenses he will incur in the future. In order to recover for future medical expenses, a plaintiff must demonstrate through a preponderance of the evidence the necessity for future medical treatments and the costs associated with those medical procedures. *See Stanley*, 197 N.W.2d at 607; *Morningstar*, 258 Iowa at 1371, 142 N.W.2d at 444; *see also Schnebly v. Baker*, 217 N.W.2d 708, 723–24 (Iowa 1974). Michels has established he will incur future medical expenses totaling at least $35,000. These expenses are for future surgery on his ankle, knee and hip.[12]

### 3. Past Lost Earnings

■ Michels is also entitled to be compensated for the reasonable value of lost wages from the date of injury to the present. *Gavlock*, 493 N.W.2d at 99. The court finds Michels has had past lost earnings totaling $49,518.04.[13]

### 4. Miscellaneous Medical and Property Damages

■ Michels also claims he has incurred miscellaneous property damages and costs related to his medical treatment. As the Iowa Supreme Court has declared, "the principle underlying allowance of damages is that of compensation, the ultimate purpose being to place the injured party in as favorable a position as though no wrong has been committed." *Adams v. Deur*, 173 N.W.2d 100, 105 (Iowa 1969). Michels asserts a claim for miscellaneous medical and property damages totaling $3,387.27.[14] The court finds, however, that because he did not make any claim for property damages in his FTCA tort claim notice he is barred by 28 U.S.C. § 2675(a)

11. The United States conceded in its post-trial brief that an award of $26,565.86 would be appropriate in this case. Def.Br. at 6.

12. The United States submitted in its post-trial brief that an award of $35,000 for future medical expenses would be appropriate. Although Michels testified that he wished to have future surgery to remove the scar on his chin, he has not carried his burden of establishing the cost of that procedure nor has he sought to recover the expenses for future arthritis pain medication. Dr. Lang's testimony concerning whether or not Michels would need a second hip replacement was

ambiguous and the court finds that Michels has failed to carry his burden of proof that, to a reasonable degree of medical certainty, Michels would need a second hip replacement. Therefore, the cost of the second hip replacement is not included in Michels' award of future medical expenses.

13. Again, the United States conceded in its post-trial brief that Michels' lost earnings totaled $49,518.04. Def.Br. at 6.

14. The United States concedes that these miscellaneous damages are appropriate. Def.Br. at 6.

from recovering $195.69 for shoes and clothing.[15] *See, e.g., Jones v. Wyeth Lab., Inc.,* 583 F.2d 1070 (8th Cir.1978). Therefore, the court shall award Michels $3,191.58 for miscellaneous damages.[16]

### 5. Past and Future Physical and Mental Pain and Suffering

■ Under Iowa law Michels is entitled to compensation for his past and future physical and mental pain and suffering. *See Holmquist v. Volkswagen of America, Inc.,* 261 N.W.2d 516, 525–26 (Iowa Ct.App.1977). In considering claims for pain and suffering, "[e]ach case must be evaluated according to the evidence peculiar to it." *Id.*

The facts of this case provide ample basis for a substantial award of damages for both past and future physical and mental pain and suffering. The court finds the United States' negligence caused Michels' past and future pain and suffering in the following respects: (1) the initial pain suffered by Michels when he impacted Dr. Ahmed's car and subsequently was thrown to the pavement resulting in multiple fractures to Michels' lower extremities as well as a large facial gash; (2) the pain which occurred as a result of Michels' medical treatment and surgeries during his stay in the hospital from March 9, 1989 until his discharge on March 24, 1989; (3) the pain Michels incurred during his recuperation at his parents' home, including Michels' mental anguish from having his mother attend to his most intimate bodily functions; (4) the pain associated with the non-union of Michels' left fibula and the necessary surgery

on June 25, 1990 to repair it; (5) the loss of enjoyment of life Michels has suffered as a result of his permanently disabling injuries; (6) Michels' embarrassment from the pronounced physical scars to his face and lower extremities; and (7) the pain which will be attendant with Michels' future medical care and surgeries, including the hip replacement surgery.

Considering the above factors, for Michels' past physical pain and suffering and for the present value of his future physical and mental pain and suffering the court awards Michels the total sum of $300,000.

### 6. Past and Future Loss of Full Body

■ Iowa law recognizes damages for disability to the body and impairment of physical functions. *Schnebly,* 217 N.W.2d at 726. This item of damage is separate and distinct from loss of earning capacity. *Id.* Damages for loss of full bodily function must not be duplicative of an award for loss of earning capacity. *Id.* As a result of the accident, Michels has sustained a twenty-five percent disability to his whole body. The court finds Michels should be awarded damages for past loss of function of his body and for the present value of Michels' future loss of full function of his body in the amount of $180,000.

### 7. Loss of Future Earning Capacity

■ The final issue of damages in this case concerns Michels' claim for loss of future earning capacity. Michels aptly characterizes this issue as the "fighting issue" in

---

15. The court, however, shall award Michels the $1,226.72 in lost tuition for the semester at Iowa State University that he was unable to complete due to his injuries. Michels alerted the United States to this aspect of his claim when he stated in his FTCA tort claim notice that he had "lost tuition and room and board expenses due to his inability to complete the spring 1989 semester at Iowa State University." Furthermore, it is unclear whether under Iowa law such a claim would constitute a "property" claim. Because the United States has not lodged an objection on this issue, the court need not resolve the question in this case.

16. 28 U.S.C. § 2675(a) makes the filing of an administrative claim with the appropriate agency a jurisdictional prerequisite for the filing of a FTCA action. *Smith v. United States,* 588 F.2d

1209, 1211 (8th Cir.1978); *Johnson ex rel. Johnson v. United States,* 788 F.2d 845, 848 (2d Cir.), *cert. denied,* 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 288 (1986). Because it is a jurisdictional requirement, it is not subject to waiver. *Nero v. Cherokee Nation of Oklahoma,* 892 F.2d 1457, 1463 (10th Cir.1989). Although a party's FTCA tort claim notice need not be so exact as to meet formal pleading requirements, it is necessary that the claim be "specific enough to serve the purposes intended by Congress in enacting § 2675(a)—'to ease court congestion and avoid unnecessary litigation while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.'" *Johnson ex rel. Johnson,* 788 F.2d at 848–49 (citation omitted).

this case regarding his claim for damages. The loss of future earning capacity is clearly a compensable item of damages under Iowa law. *Sallis v. Lamansky,* 420 N.W.2d 795, 798 (Iowa 1988); *Holmquist,* 261 N.W.2d at 525; *Hysell v. Iowa Public Serv. Co.,* 559 F.2d 468, 473 (8th Cir.1977). An impairment of a party's physical capacity creates an inference that the party has a lessened earning capacity. *Holmquist,* 261 N.W.2d at 525. "The measure of damages for loss of earning capacity is 'the difference between the value of an individual's services, if working, as he would have been but for the injury, and the value of the services of an injured person, if working, in the future.'" *Sallis,* 420 N.W.2d at 798 (quoting *Anthes v. Anthes,* 258 Iowa 260, 270, 139 N.W.2d 201, 208 (1965)). This item of damage compensates for a loss of earning capacity, not the actual loss of earnings. *Id.* Thus, in considering such a claim, the fact finder must evaluate the general impairment to the plaintiff's wage earning capacity rather than the loss of wages from a specific occupation. *Hysell,* 559 F.2d at 473; *Holmquist,* 261 N.W.2d at 525; *Grant v. Thomas,* 254 Iowa 581, 585, 118 N.W.2d 545, 548 (1962). As the Iowa Supreme Court has pointed out:

> There is no requirement such loss need be measured in a vacuum; ordinarily considered are plaintiff's poor health, education and opportunity for education, age, intelligence, industriousness, manner of living, sobriety or temperance, frugality or lavishness or other personal characteristics which affect ability to secure business or earn money.

*Ehlinger v. State,* 237 N.W.2d 784, 792 (Iowa 1976).

■ The parties have extremely divergent positions with respect to this issue. Michels contends the present value of his damages for lost earning capacity is between $487,903 and $691,623, depending upon the level of education he attained. The United States, on the other hand, contends Michels should be awarded $53,104 to compensate him for the costs of attending college for four years, and for one year of lost wages. The United States further contends that with retraining Michels will have no damages for

loss of future income capacity because he will be able to attain a white collar position at a rate of pay equal to or exceeding what he would have made prior to the accident. Therefore, the United States concludes Michels should be awarded no additional damages for loss of future income earning capacity.

Because of Michels' injuries to his lower left extremity, he can stand or walk for no more than ten to fifteen minutes. He is limited to "light" or "sedentary" activities. Michels' physical limitations restrict him from gainful employment in those vocations classified as "very heavy," "heavy," "medium," and that segment of jobs classified as "light" which require extensive standing and walking. Michels' employment opportunities, regardless of skill level, are restricted to approximately thirty percent of the total job market. In the unskilled job arena, Michels is ineligible for approximately eighty to ninety percent of the jobs in that classification. Michels' past work history and education currently place him in the unskilled category. Roger F. Marquardt, a vocational rehabilitation specialist, estimated that if Michels obtained a college degree or vocational education he would be able to move up to skilled or semi-skilled work enabling him to equal his pre-injury earning potential, but he would still be restricted to thirty percent of the total job market.

Dr. Michael L. Sandberg, a professor of finance at Coe College, calculated that the present value of Michels' lost earnings was either $691,623 or $487,903, depending upon Michels' level of educational achievement. In arriving at his calculations, Sandberg relied upon the United States Department of Labor's 1987 *Worklife Expectancy of Disabled versus Non–Disabled Person's by Sex, Race, and Level of Educational Attainment,* the "Gamboa report". Following the Gamboa report's conclusions, Sandberg's analysis included a work life expectancy reduction of 50.3 percent for a high school graduate, and a 32.3 percent reduction for a college graduate.

Clearly, Michels' serious injuries will place profound limitations on his ability to attain meaningful employment. The proposition

put forward by the United States, that after Michels completes college he will have sustained no diminution in future earning capacity as a result of his injuries, is both quixotic and insupportable under Iowa law. Although Michels may indeed graduate from college and obtain a position paying more than he would have earned had he pursued farming as his vocation, this item of damages is intended to compensate a party for a loss of earning capacity, not that party's actual loss of earnings. *Sallis*, 420 N.W.2d at 798. In evaluating Michels' loss on this damage element, the court has considered the general impairment to his earning capacity. *See Hysell*, 559 F.2d at 473. Specifically, the court has considered the fact that even with a college degree Michels is limited to only thirty percent of the total job market. The smaller the job market, the more limited that individual's prospects are of obtaining employment. The limitations on Michels' prospects of obtaining employment will, in turn, restrict his future income because he will be at a disadvantage to change jobs to react to fluctuations in the economy, or to situations in his personal life such as geographic relocation or loss of employment. A further consideration is that Michels' future medical needs will require him to be absent from the workplace for surgery and recovery. Therefore, the court finds Michels has sustained damages from loss of future earning capacity.

Dr. Sandberg's calculations for Michels' lost earnings were premised on conclusions drawn from the Gamboa report that Michels will have either a 50.3 or 32.6 percent reduction in work life as a result of his disability. The court finds these reductions in Michels' work life expectancy to be unsupported by the record. The Gamboa report suffers from several deficiencies which render it unreliable in assessing Michels' work life expectancy. First, the Gamboa report was completed prior to passage of the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101–12213.[17] This is significant because

the Gamboa report does not consider the impact the ADA will have on opening economic opportunities for individuals with disabilities. Second, and more importantly, the Gamboa report lumped together without differentiation persons suffering from both mental and physical disabilities. Michels suffers from no mental abnormalities, only physical impairments to his lower left extremity. Finally, while the subjects of the report were required to have at least a five percent whole body impairment or be eligible for social security benefits, the study does not evaluate the work life expectancy of individuals according to whole body disability ratings. Thus, it is not clear whether a person, such as Michels, who suffers from a twenty-five percent whole body impairment will have a reduced work life expectancy equal to the mean reduced work life expectancy of subjects in the Gamboa report. Therefore, the court will disregard Sandberg's reductions for work life expectancy. Indeed, Michels' own vocational rehabilitation expert, Mr. Marquardt, testified that based upon his current condition he did not believe Michels suffered a reduced work life expectancy. Equally as important, there was simply no medical evidence that Michels' present or expected future medical condition would reduce his work life expectancy. Thus, Dr. Sandberg had no basis in fact for projecting the results of the Gamboa report to Michels' present or future physical condition and his own work life expectancy.

Although Michels has had academic difficulties, partially due to the hardships caused by this accident, the court finds Michels has the ability to complete a four year college program and obtain a white collar position. Michels is dedicated with an excellent work ethic. These attributes lead the court to the conclusion that he will overcome past academic difficulties and persevere in his college studies.

In sum, the court agrees with the thrust of Michels' assertion that his future earning

---

**17.** In the congressional findings that accompany the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities" and that "discrimination against individuals with disabilities continues to be a serious a pervasive social problem." 42

U.S.C. § 12101(a)(2). Additionally, Congress stated that one of the purposes of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

capacity has been impaired, albeit for reasons that differ substantially with Dr. Sandberg. Thus, the court does not accept Dr. Sandberg's present value calculations for lost earning capacity between $487,903 and $691,623, depending on the level of education Michels will achieve. His calculations are based primarily upon his projections of a substantially shortened work life expectancy for Michels.

The court concludes that the present value of Michels' loss of future earning capacity due to the physical impairment caused by this accident is $190,000. This is the court's best judgment as to Michels' economic loss resulting from the fact that Michels is now limited to approximately thirty percent of the total job market.

### 8. Total Damages

The court finds Michels has sustained damages totaling $784,275.48 as a result of the motor vehicle collision. These damages are: past medical expenses, $26,565.86; future medical expenses, $35,000; past lost earnings, $49,518.04; miscellaneous damages, $3,191.58; past and future physical and mental pain and suffering, $300,000; past and future loss of full body, $180,000; loss of future earning capacity, $190,000.

### C. Michels' Attempt To Amend His FTCA Tort Claim Notice

 The court finds that Michels has sustained $334,275.48 in damages in excess of the amount claimed in the *ad damnum* clause of his FTCA tort claim notice. The second major issue of contention in this case is whether Michels can amend his complaint to seek damages in excess of those sought in his FTCA tort claim notice. As noted above, the FTCA prohibits a party from recovering more than originally claimed in the *ad damnum* clause of the tort claim notice unless the party can prove one of the two exceptions provided for in the law, namely, that the party has newly discovered evidence which was not reasonably discoverable at the time the tort claim notice was filed or the existence of intervening facts related to the claim. 28 U.S.C. § 2675(b). The purpose of the FTCA tort claim notice requirement is to "ensure that '[t]he government will at all

relevant times be aware of its maximum exposure to liability and will be in a position to make intelligent decisions.'" *Reilly v. United States,* 863 F.2d 149, 173 (1st Cir.1988) (quoting *Martinez v. United States,* 780 F.2d 525, 530 (5th Cir.1986)); *see also* S.Rep. No. 1327, 89th Cong., 2d Sess. 2 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2515, 2516 (fundamental purpose of requiring an FTCA tort claim notice is "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States").

### 1. Burden of Proof

The courts have uniformly placed the burden of proving either intervening facts or newly discovered evidence on the FTCA claimant. *Allgeier v. United States,* 909 F.2d 869, 877 (6th Cir.1990); *Kielwien v. United States,* 540 F.2d 676, 680 (4th Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976).

### 2. Lines of Authority

Review of the pertinent precedents reveals two divergent lines of authority with respect to modification of a claim for damages under the FTCA.

*(a). Eleventh Circuit Approach.* Representative of the first line of cases is the approach taken by the Eleventh Circuit in *Cole v. United States,* 861 F.2d 1261, 1262 (11th Cir.1988). In *Cole,* the court reaffirmed that "a reasonably based change in expectation as to the severity and permanence of an injury is newly discovered evidence within the meaning of section 2675(b)." *Id.; see also Fraysier v. United States,* 766 F.2d 478, 481 (11th Cir.1985). The plaintiff in *Cole* was permitted to recover damages in excess of his FTCA tort claim notice where he did not learn until some twenty-one months after his tort claim notice was filed that he suffered from a permanent condition, thrombophlebitis, which would prevent him from returning to work. *Cole,* 861 F.2d at 1263.

In arriving at its decision in *Cole,* the Eleventh Circuit cited with favor *Husovsky v. United States,* 590 F.2d 944 (D.C.Cir.1978), and *United States v. Alexander,* 238 F.2d

314, 318 (5th Cir.1956). In *Husovsky*, the plaintiff was allowed to recover additional damages where his improvement in general condition following a motor vehicle accident increased his life expectancy. *Id.* at 955. The court noted that

> the intervening increase in appellee's life expectancy increased the amount of kidney dialysis and other future medical treatment he would require in the future, the total amount of reduction in earning potential during his life, and the total pain and suffering he would endure. Thus, it surely constitutes 'an intervening fact, relating to the amount of [his] claim' against the United States.

*Id.*

In *Alexander*, 238 F.2d at 318, the Fifth Circuit affirmed plaintiff's recovery of a greater amount than requested in his FTCA tort claim notice. The plaintiff, who was injured when the motorcycle he was riding collided with a truck belonging to the federal government and operated by a federal employee suffered a dislocated shoulder. *Id.* at 315. At the time plaintiff's FTCA tort claim notice was filed, it was uncertain whether plaintiff's shoulder would require surgery. *Id.* It was subsequently determined that plaintiff's shoulder would require surgery. *Id.* at 316. The district court permitted plaintiff to increase his claim on the grounds that plaintiff's need for shoulder surgery was not known at the time the FTCA tort claim notice was filed. *Id.* at 318.

Similarly, an increase was permitted in *Molinar v. United States*, 515 F.2d 246, 249 (5th Cir.1975). The Fifth Circuit held that plaintiff's three knee surgeries and ensuing medical care constituted intervening facts. *Id.* In *Allgeier v. United States*, 909 F.2d 869, 879 (6th Cir.1990), after discussing various interpretations courts have taken on the issue of amending tort claims, the Sixth Circuit affirmed the awarding of damages in excess of plaintiff's FTCA tort claim notice. The plaintiff in *Allgeier*, who had both knees injured in a motor vehicle collision, had seen marked improvement in her condition immediately before the filing of her FTCA tort claim notice, but had then seen her condition deteriorate after the filing of her claim. *Id.*

at 878–79. In upholding the district court's conclusion to allow an amendment, the court grounded its conclusion upon its finding that plaintiff's need for a second knee operation and additional treatment were "not reasonably foreseeable" at the time the tort claim notice was filed due to the post-filing deterioration of her medical condition. *Id.*

Finally, in *Spivey v. United States*, 912 F.2d 80, 85–86 (4th Cir.1990), the claimant developed a condition which was a known side effect of medication she was taking, but had exhibited no symptoms of the side effect prior to filing her FTCA tort claim notice. The Fourth Circuit held that the occurrence of this drug-induced side effect constituted newly discovered evidence under section 2675(b). *Id.*

Under the approach adopted by the Eleventh Circuit, a claim may be increased when the claimant either did not know or reasonably could not have known the severity of the injury at the time the FTCA tort claim notice was filed. *Cole*, 861 F.2d at 1263.

*(b). First Circuit Approach.* A second line of cases, which strictly construes the requirements of 28 U.S.C. § 2675(b), is illustrated by the First Circuit's decision in *Reilly v. United States*, 863 F.2d 149 (1st Cir. 1988). In *Reilly*, the court of appeals emphasized that "intelligence which serves only to bear out earlier suspicions cannot unlock the FTCA's narrow escape hatch. Diagnoses which are no more than cumulative and confirmatory of earlier diagnoses are neither 'newly discovered evidence' nor 'intervening facts' for the purposes of § 2675(b)." *Id.* at 171. The claimant in *Reilly* sustained catastrophic injuries at birth due to medical malpractice. *Id.* at 153. Her parents filed an FTCA tort claim notice on her behalf for $10,000,000, and when the claim was not settled, her parents initiated a FTCA action. *Id.* At trial the claimant requested damages in excess of the FTCA tort claim notice. *Id.* at 171. The district court granted her request, and awarded claimant $11,037,964 on the basis that only after the FTCA tort claim notice was filed was it medically possible to know the extent of claimant's injuries. *Id.* The trial court held "'the experts' subsequent confirmation that the worst possibili-

ties had materialized to constitute 'newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency....'" *Id.* (quoting *Reilly v. United States,* 665 F.Supp. 976, 1011 (D.R.I. 1987)). In reversing, the First Circuit held that "the fact that the degree of disability was uncertain was, in and of itself, inadequate to trigger the exception to § 2675(b)." *Id.* at 172–73. Thus, even though "the worst-case scenario" had come to pass, the claimant was barred from increasing her claim because she had been put on "fair notice" of that possibility. *Id.* The rationale for that decision was that the government was entitled to be aware of its "maximum possible exposure to liability" and that between the government and the claimant, the claimant was in the best position to make that determination. *Id.* at 173.

A case on all fours with *Reilly,* and in fact heavily relied upon by the First Circuit in *Reilly,* is the Fifth Circuit's decision in *Low v. United States,* 795 F.2d 466 (5th Cir.1986). In *Low,* the claimant was again the victim of medical malpractice during his birth. At the time the FTCA tort claim notice was filed the claimant was two years old, but the extent of his recovery could not be determined until he was four or five years of age. *Id.* at 470. In reversing the district court and restricting plaintiff to the award of the amount originally sought in the FTCA tort claim notice, the Fifth Circuit held that because claimant knew the "worst case prognosis" at the time the tort claim notice was filed, the evidence which was undiscoverable at the time the claim was filed went to "the precision with which the severity of [the claimant's] condition could be known." *Id.* at 471. The rationale and policy undergirding the *Low* decision is

'to ensure federal agencies charged with making an initial attempt to settle tort claims against the United States are given full notice of the government's potential liability.' Section 2675 should be interpreted so that '[t]he government will at all relevant times be aware of its maximum possible exposure to liability and will be in a position to make intelligent settlement decisions.'

*Id.* (quoting *Martinez v. United States,* 780 F.2d 525, 530 (5th Cir.1986).[18]

Thus, under the approach adopted by the First Circuit, a claimant may not amend his or her claim for higher damages unless the claimant has new information which was not reasonably discoverable at the time the FTCA tort claim notice was filed and such information does not go to the severity of claimant's known injuries.

*(c). The Eighth Circuit.* The Eighth Circuit Court of Appeals has not yet ruled on the approach it will adopt. However, based on the Eighth Circuit's decision in *McMichael v. United States,* 856 F.2d 1026, 1035 (8th Cir.1988), this court concludes the approach championed by the Eleventh Circuit is more in conformity with *McMichael* than the approach of the First Circuit.[19]

---

18. A recent district court opinion from the First Circuit involving traffic accident claims is illustrative of the approach adopted by the First Circuit Court of Appeals. In *Myers v. United States,* 805 F.Supp. 90, 91 (D.N.H.1992), the claimant sustained two leg fractures in a collision with a postal service employee. Claimant's initial surgery resulted in a diagnosis of the two leg fractures as well as a partial tear of a knee ligament. *Id.* Follow up examinations revealed "mild medial laxity" in claimant's left knee. *Id.* After he filed his FTCA tort claim notice, claimant was diagnosed as having "anterior cruciate ligament instability" and a second surgery was recommended. *Id.* at 92. Thereafter, a United States magistrate judge permitted claimant to increase the amount of his claim. In reversing the order of the magistrate judge, the district court found that the second knee surgery was "cumulative and confirmatory of earlier diagnoses." *Id.* at 93. Because claimant's subsequent knee surgery was not unforeseeable, he would bear the burden of his "failure to depict the worst-case scenario." *Id.*

19. Only four Eighth Circuit opinions mention 28 U.S.C. § 2675(b). *See Jones v. Wyeth Lab., Inc.,* 583 F.2d 1070 (8th Cir.1978) (discussing section's requirement that claimant present claim to agency before filing action in district court); *Lunsford v. United States,* 570 F.2d 221, 226 (8th Cir.1977) (discussing sum certain requirement of § 2675(b)); *Melo v. United States,* 505 F.2d 1026, 1029 (8th Cir.1974) (noting sum certain requirement of § 2675(b)); *United States v. Peter Kiewit Sons' Co.,* 345 F.2d 879, 882 (8th Cir.1965) (discussing pre–1966 provision on withdrawal of claim).

In *McMichael,* the Eighth Circuit affirmed the district court's finding that inflation which occurred during the ten year interval between claimant's injuries and trial on the matter constituted an intervening fact. *Id.* In arriving at its decision, the district court found that the level of inflation which occurred during the applicable time period was unforeseeable, as was the extended amount of time required for the litigation to reach its conclusion. *Id.* A key factor in the Eighth Circuit's decision was the unforeseeability of the level of inflation which occurred during the length of the litigation which resulted in a fifty percent decline in the value of the dollar. *Id.* Because inflation was deemed an intervening fact, despite its permanent presence in the economy, the Eighth Circuit's interpretation of section 2675(b) permits plaintiffs to increase their claims when faced with an unexpected change in the severity of a factor related to damages. Thus, the rationale of *McMichael* serves as a barometer suggesting greater affinity with the Eleventh Circuit approach than the First Circuit approach. "Just as no barometer is a precise predictor of tomorrow's weather, no prior case, which can be factually or doctrinally distinguished, is a perfect predictor of how the Court will decide a related but different case. Nevertheless, we cannot avoid our obligation to forecast or predict how the Court will decide troubling cases involving new factual situations." *Jaffee v. United States,* 663 F.2d 1226, 1228 (3d Cir.1981), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982).

*(d). Policy Reasons.* Additionally, a substantial policy consideration leads the court to conclude that the approach followed by the Eleventh Circuit is preferable to that of the First Circuit. The Eleventh Circuit standard is more likely to advance settlements of claims than that forwarded by the First Circuit. A plaintiff under the Eleventh Circuit approach will more likely assert claims based on injuries which are current and assessable. Current claims based on probable future damages facilitate evaluation because they are neither as intricate nor as complex as those typically associated with contingent future damage claims. Thus, the government is placed in a better position to decide wheth-

er to settle a specific claim based on current diagnoses. Under the worst case scenario method of the First Circuit, the plaintiff must assert all his or her claims for damages, no matter how remote or distant the possibility that those damage claims will come to fruition, or run the risk that he or she will be barred from asserting them in a subsequent FTCA action. Because of the bloated nature of such claims, the government is forced to sift through plaintiff's damage claims in order to assess the current state of plaintiff's damages and the probability of future consequences before any real settlement negotiations may occur.

Settlement is also facilitated by the Eleventh Circuit standard because the parties are in general equipoise in negotiating positions. If the government delays settlement and the plaintiff experiences an unexpected increase in the severity of his or her injuries, the government may be held liable for the respective increase in damages. Thus, even though prejudgment interest may not be awarded against the government pursuant to 28 U.S.C. § 2674, the government has no incentive to delay settlements with plaintiffs. Therefore, the Eleventh Circuit approach is in keeping with and facilitates the fundamental purpose of the FTCA tort claim notice requirement of § 2675(b), which is "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States." S.Rep. No. 1327, 89th Cong., 2d Sess. 2 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2515, 2516; *Reilly,* 863 F.2d at 173.

### 3. Analysis

 The court finds that Michels has sustained his burden of proof on this issue and that his early onset of arthritis, the need for hip replacement surgery as well as his inability to pursue farming as his vocation constitute "newly discovered evidence" or "intervening facts" within the meaning of 28 U.S.C. § 2675(b).

*(a). Arthritis.* In his FTCA tort claim notice, Michels did not list development of arthritis in any form as an element of his

damages. Although Dr. Lang made mention in his letter of September 21, 1990 of Michels' possibility of developing post-traumatic arthritis in his hip, Dr. Lang made no diagnosis of arthritis at that time nor of Michels' need for future ankle surgery as a result of arthritis. Dr. Callaghan, however, found arthritis in Michels' left knee on February 4, 1992, and noted that Michels may require knee replacement and ankle arthrodesis in the future due to arthritis. Dr. Balint's evaluation also found that Michels was developing osteoarthritis and would probably need "triple arthrodesis" in the future.[20] Balint's medical report does not mention any finding of arthritis in Michels' left hip or knee, but does state he is at "high risk" for developing it. The court finds that because Michels was not fully apprised of his possibility of developing arthritis in his knee and ankle at the time he filed his FTCA tort claim notice, his development or probable development of arthritis in those joints constitutes a reasonably based change in expectation as to the severity of his injuries. Thus, Michels' arthritic condition is "newly discovered evidence" or an "intervening fact" within the meaning of 28 U.S.C. § 2675(b) which warrants allowing Michels to seek damages in excess of those sought in the *ad damnum* clause of his FTCA tort claim notice. *See Fraysier*, 766 F.2d at 481.[21]

(b). *Hip Replacement Surgery*. The court further concludes that Michels' need for hip replacement surgery constitutes newly discovered evidence or an intervening fact in this case warranting amendment of Michels' FTCA tort claim notice. In September of 1990, Michels was unaware he would need hip replacement surgery in the future. At the time he filed his FTCA tort claim notice he had only been apprised by Dr. Lang that he would have "some degree of stiffness in that hip." Although Dr. Lang had advised Michels of the possibility that if necrosis of the hip developed, it would require hip replacement surgery, Dr. Lang found no evidence of that condition as of September 21, 1990. Furthermore, Dr. Lang had told Michels that loss of blood to the hip was usually evident within 18 months of the injury. At the time Michels filed his FTCA tort claim notice, 18 months after the March 1989 accident, Michels had shown no signs of loss of blood supply to his hip. It was therefore not reasonably foreseeable that Michels would require hip replacement surgery at the time he filed his FTCA tort claim notice. The court concludes from this that the marked and unexpected deterioration in the condition of Michels' hip warrants permitting him to amend his damage claim. *See Allgeier*, 909 F.2d at 879.

(c). *Michels' Inability to Farm*. The third item constituting newly discovered evidence or an intervening fact is Michels' inability to pursue farming with his father as his chosen lifetime vocation. Because of the injuries he sustained in the accident, Michels has been forced to abandon his plans of farming with his father after completing college. In Dr. Lang's September 1990 assessment of Michels' injuries he concluded that Michels "would be able to crop farm satisfactorily, although with some symptoms. However, he may be somewhat limited to [sic] his ability to regularly handle livestock." Michels was consistently told by Dr. Lang that once his ankle had mended, he would be able to crop farm. Following this advice, Michels enrolled in community college courses with the expectation that he would return to farm-

---

20. Triple arthrodesis is the "surgical fusion of the talonavicular, tabcalcaneal, and calcaneocuboid joints." Stedman's Medical Dictionary 135 (25th ed. 1990).

21. The court also observes that even under the First Circuit's approach, Michels' post-traumatic arthritic condition would constitute newly discovered evidence under § 2675(b). *See Reilly*, 863 F.2d at 171. Because Dr. Lang made mention only of Michels' general possibility of developing post traumatic arthritis in his left hip, Michels had not been given fair notice of the worst case prognosis. Therefore, Drs. Callaghan and Balint's subsequent diagnoses of that condition in his left knee and left ankle did not go to defining the precise severity of Michels' injuries, but constituted the finding of new injuries undiscoverable by Michels' reasonable efforts. *See generally Low*, 795 F.2d at 471; *Myers*, 805 F.Supp. at 93. Thus, under this standard, Michels would not be held responsible for failing to present the worst-case scenario in his administrative claim because the extent of Michels' injuries could not be reasonably determined until after expiration of the time for filing his FTCA tort claim notice. *See Low*, 795 F.2d at 470–471.

ing. In the winter of 1990–1991, however, after the FTCA tort claim notice was filed, Michels first realized that farming was no longer a viable employment option for him due to the severity of his injuries and the impact those injuries had upon his ability to carry out day to day activities on the farm.

Much like the plaintiff in *Cole,* Michels did not learn until after his FTCA tort claim notice was filed that the severity and permanence of his injuries would prohibit his return to his chosen profession. *See Cole,* 861 F.2d at 1263. Michels' inability to return to farming has resulted in past mental distress to him and a loss of past wages. Furthermore, it affects his future income capacity and his future mental pain and suffering. The court, therefore, concludes that Michels' inability to return to farming constitutes newly discovered evidence or an intervening fact warranting Michels to amend his FTCA tort claim notice.[22]

## IV. THE EFFECT OF GRANTING MICHELS' AMENDMENT TO THE FTCA TORT CLAIM NOTICE

■ Granting Michels' amendment to his FTCA tort claim notice does not resolve the question of Michels' entitlement to the full damages of $784,275.48. Indeed, the plain language of 28 U.S.C. § 2675(b) strongly militates against a holding that allowing Michels to amend permits the entire damages genie to escape from Aladdin's lamp. In other words, the court believes that Michels is entitled to only those damages over and above his FTCA tort claims notice directly related to the "newly discovered evidence" or "intervening facts" which form the basis for Michels' amendment to the FTCA tort claims notice. 28 U.S.C. § 2675(b) states:

(b) Action under this section *shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence* not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of

intervening facts, relating to the amount of the claim. (emphasis applied).

As in all cases involving statutory construction, the court's "starting point must be the language employed by Congress...." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). This court also assumes "that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Thus, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *State of Arkansas by Scott v. Block,* 825 F.2d 1254, 1258 (8th Cir.1987). Here, the plain language of section 2675(b) ties any increase in damages above the amount sought in the FTCA tort claim notice to evidence supporting the increase. Courts have construed section 2675(b) as requiring a claimant to demonstrate a nexus between the amount sought in increased damages and the "newly discovered evidence" or "intervening facts". *See Monday v. United States,* 688 F.Supp. 788, 791 (D.Me.1988); *cf. McMichael,* 856 F.2d at 1035 (intervening fact in case justified increase in damage award). Therefore, Michels is entitled to increase his damage claim in his FTCA tort claims notice only to the degree that "newly discovered evidence" or "intervening facts" support such an increase.

The court has found that Michels has sustained $334,275.48 in damages in excess of the $450,000 amount claimed in the *ad damnum* clause of his FTCA tort claim notice. Of that amount, the court finds that $260,000 is directly attributable to damages arising from the "newly discovered evidence" or "intervening facts". Thus, $74,275.48 in total damages over and above the $450,000 damages asserted in the *ad damnum* clause of the FTCA tort claim notice are not attribut-

---

**22.** The court further finds that this legal conclusion not be altered under the rubric of the First Circuit. Under the worst case scenario painted

by Dr. Lang, Michels might have been unable to continue his hog operation plans but he could reasonably expect to be able to row crop farm.

able to damages arising from the "newly discovered evidence" or "intervening facts". Therefore, Michels is entitled to recover $710,000 of the total damages of $784,275.48.

### V. ORDER FOR JUDGMENT

For the reasons set forth above, the court concludes:

(1) that Michels' Motion to Amend Federal Tort Claim filed on September 10, 1992, is granted; and

(2) that Michels has sustained damages as a direct result of the negligence of the United States' employee, Iqbal Ahmed, and that judgment be entered against Defendant United States in the sum of $710,000. It is ordered that judgment be entered accordingly.

IT IS SO ORDERED.